444 HEMSTREET *et al. v.* BURDICK. [Sept. T.

Syllabus.

WILLIAM F. HEMSTREET *et al.*

*v.*

MARTIN BURDICK.

1. DEED—*whether by parties individually or officially.* Where a deed purports, on its face, to be made by the "trustees of schools in township," etc., of the first part, and they, by the same description, as parties, relinquish the

right of homestead, and covenant to warrant the title for themselves and their successors in office, though signed by their individual names only, on proof they were such trustees it will be held to be the deed of the corporation they represent, and to pass the title of the corporation. If this were not so, the deed would still pass the equitable title to the grantee.

2. CLOUD *upon equitable title.* On a bill in equity to remove a cloud from the complainant's title to land, an equitable title is all that is required to support the allegation of ownership of the title.

3. POWER OF ATTORNEY *to sell land, includes power to convey.* A power of attorney "to sell or lease any and all real estate" belonging to the maker of the instrument, confers the power to contract to sell and to convey or transfer the property sold.

4. SAME—*construction.* Although a power of attorney must be strictly construed, yet the rule does not require a construction that will defeat the intention of the parties. Where the intention fairly appears from the language used, that intention must control.

5. AGENT—*sale in payment of his own debt.* Where a party, after the execution of a mortgage upon a tract of land to secure a debt owing by him, conveyed the same and various other lands to his brother-in-law, who gave him his promissory notes for the purchase money thereof, and also a power of attorney, empowering him to sell or lease any or all of such lands, and such agent conveyed the mortgaged land mentioned to the mortgagee in discharge of the mortgage and mortgage debt, and gave up to his principal a corresponding amount of his own obligations for the purchase money, and entered satisfaction upon the record of the mortgage given by the principal to him to secure the purchase money of the lands sold the former, and the agent and principal afterwards adjusted their accounts, and the lands remaining undisposed of were reconveyed partly to the agent and partly to his wife, it not appearing the land conveyed to the mortgagee of such agent was worth more than the incumbrance, it was *held,* that the principal could not afterwards avoid the transfer to the mortgagee as against a *bona fide* purchaser from the latter, and that even if he could, the satisfaction of the mortgage would be avoided, and the mortgage still remain a lien on the premises.

6. SAME—*innocent purchaser protected against fraud of agent on principal.* Where an agent, duly empowered to sell and convey, conveys his principal's land in payment of the agent's own debt, a *bona fide* purchaser of the land from the grantee, without notice of the misapplication of the purchase money or of the fact of the sale being in payment of the agent's debt, will be protected.

7. MORTGAGE—*satisfaction by agent's sale, when sale is repudiated.* Where the agent of the owner of land upon which there is an incumbrance by mortgage, given by the agent while the owner, conveys the land under a power of attorney to sell, in satisfaction of the mortgage and in payment of the debt,

if the principal repudiates the act and seeks to hold the land for want of authority in the agent, the consideration for the release of the mortgage will fail, and there will be no release or satisfaction.

APPEAL from the Circuit Court of Iroquois county; the Hon. N. J. PILLSBURY, Judge, presiding.

Messrs. TULEY, STILES & LEWIS, for the appellants.

Messrs. BOVIE, DOYLE & WRIGHT, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

The lands in controversy, with others, were purchased by D. B. Gardner of the trustees of schools of the township in which they were situated. They were in sec. 16, and amounted in the aggregate to 400 acres. The purchase was made in 1856. Gardner and his brother, who were partners, gave their note for the purchase money. D. B. Gardner and his wife executed to the trustees a mortgage to secure the payment of the note given for the purchase money. They paid but a small portion of the interest on the debt, and no portion of the principal. In October, 1859, the Gardners conveyed these, with a large amount of other lands, amounting to 1920 acres, to one Hemstreet, the brother-in-law of S. S. Gardner, for the expressed consideration of $20,500, for which he gave them a mortgage on the land, to secure the payment of four promissory notes, of $5125 each,—the amount of the purchase money for these lands. Hemstreet executed a power of attorney to D. B. Gardner, authorizing him to sell or lease and collect rents for these lands.

The lands purchased of the trustees were subject to the mortgage for the purchase money when they were conveyed to Hemstreet, and they having sued to recover the interest on the note, about the 19th day of April, 1862, D. B. Gardner effected an arrangement with the trustees, by which he settled and discharged this indebtedness by conveying to them, under the power of attorney, the land in controversy, with other

lands, to the trustees, and they surrendered to him his note, and they also executed and delivered to him a release of the mortgage and debt. At this time the debt amounted to about $2000. The release purported, in consideration of $2000, to discharge the Gardners and Hemstreet. The Gardners, at the same time, released the Hemstreet mortgage on section 16 to them. Hemstreet conveyed 400 acres of the lands he purchased of the Gardners, for the consideration of $500, to one Kirby. On the 9th day of August, 1862, Hemstreet conveyed to the wives of the Gardners 600 acres of the lands they had conveyed to him, for $500, with two lots in Middleport. On the same day he conveyed to the Gardners 620 acres of the lands thus purchased, for $1500.

These four conveyances embrace all the lands sold and conveyed by the Gardners to Hemstreet. Hemstreet seems to have received, according to these deeds, $9000, for which he had, but two or three years previously, paid, or agreed to pay, $20,500. There is no evidence that he ever paid any taxes on the lands, but, on the contrary, it is shown he never did. He says he directed his agent, D. B. Gardner, to pay them; that one Scott purchased the 80 acres in controversy from the school trustees, in April, 1868, and received a deed therefor; that he went into possession and improved the same; that he sold the same to appellee on the 26th of September, 1871, and conveyed to him by deed of that date, and he went into possession and has occupied it ever since.

Hemstreet and wife conveyed about 800 acres of land to Spencer, including the tract in controversy. That deed bears date the 28th day of August, 1874. The bill charges that conveyance to be a fraud on the rights of appellee, and operates as a cloud on his title, and prays that the title to this land held by Spencer be decreed to be held in trust for appellee, and that he be compelled to convey the same to him.

The defendants answered the bill, denying all the material allegations, but the answers were not under oath, it having been waived by complainant. A hearing was had, when the court

below decreed the relief sought, and required Spencer to convey, or, in default, that the master execute a deed on his behalf for the land in controversy, and from that decree defendants appeal.

It is first insisted that the deed from the trustees of schools failed to pass title. It is objected that it is signed by those individuals without the addition that they are trustees. On turning to the transcript of the record, we find that the deed is made between the " trustees of schools in township twenty-six (26) north of range thirteen (13) west of the second principal meridian," of the first part. They, by the same description, as parties, relinquish the right of homestead and covenant to warrant the title for themselves and their successors in office, and there was proof that these persons were the school trustees of the township who had owned, and then claimed to own, the land. From this it appears, beyond all doubt, that the intention was to convey the land, and to do so as trustees —as officers of the corporation; and even if it did not pass the legal title, it unquestionably did the equitable. Of that there can be no doubt, and as this is a proceeding in equity and not at law, an equitable title is all that is required to support the allegation of ownership of the title. If appellee holds the equitable fee, in a court of chancery he will be treated as the owner in fee.

It is urged that the deed is not under seal, and in abstracting the record, we find the deed described as conveying the land, and signed by the three trustees, but without seals affixed to their names, and the names are under quotation marks. On turning to the transcript of the record, we find the names signed to the deed as indicated in the abstract, and we also find a seal annexed to each name, which is omitted in the abstract. It therefore appears, the objection that the deed is not under seal has no foundation in fact.

It is also insisted that the power of attorney to D. B. Gardner from Hemstreet conferred no power to convey; that it authorized him to sell, lease, collect rents, etc., and that such

was the construction put on it by Gardner and Hemstreet, as the former always, on making a sale, sent the deed to the latter to execute. It is immaterial what construction the parties to the instrument gave it, as it does not appear that the trustees knew of their so doing. They purchased under the advice of an attorney that Gardner had power to make the conveyance, and we presume they acted in good faith. But it is not material what the attorney in fact, or his principal, may have supposed,—the question is, whether the instrument did confer the power. This is the language of the power of attorney conferring the power to act: "To sell or lease any and all real estate belonging to me in said county of Iroquois, and to collect rents for any such property so rented or leased by him, and in and about the leasing, selling and collecting of rents, or any of them, as aforesaid, to do any and all matters and things as fully as I could do were I personally present and doing the same." The whole question turns on the meaning that shall be given to the word "sell." . Its popular meaning, we think, clearly embraces the power to contract to sell and to convey or transfer the thing sold. To complete the sale there must be a transfer of the title as well as the thing sold. When the term is applied to personal property, there is no doubt it embraces the delivery as well as the bargain for the sale,—that it in such cases means the bargain for the sale, the receipt of the purchase money and the delivery of possession, by which the sale is completed and the title vested in the purchaser. So in regard to real estate, the word "sell," in its popular sense, implies the contract and its completion by conveyance. All know that a sale of land is not complete until a conveyance is made to the purchaser—until the title has passed to and vested in him. A contract or agreement to sell does not pass the title at law, although in equity the land is considered as belonging to the buyer; but even in that forum the sale is not considered as complete, as it will compel a specific performance, and complete the sale by a conveyance of the title. We regard the word "sell," as used here, as giving

29—90 ILL.

ample power to complete a sale by making a deed of conveyance to the purchaser. Such is the ruling of the courts of California and Massachusetts. See *Fogarty* v. *Sawyer*, 17 Cal. 591, and *Valentine* v. *Piper*, 22 Pick. 85. This is, then, we think, supported by reason, and also by authority.

But it is said the power must be strictly construed. This may be true, but it does not require that it shall be so construed as to defeat the intention of the parties. Where the intention fairly appears from the language employed, that intention must control. A strained construction should never be given to defeat that intention, nor to embrace in the power what was not intended by the parties. According to the fair and reasonable meaning of the words, we think power to convey was conferred.

It is likewise insisted, that even if D. B. Gardner had power to convey he could not do so to pay his own debts; that the agent has no power to divert the price to his own use. But in this case the conveyance was made to satisfy a mortgage on the land, and which, if not paid, would have defeated Hemstreet's title. It is true that Gardner was bound to pay it, and Hemstreet held his covenants for its payment as well as his covenants against all other defects of title. There is no evidence to show the land was worth any more, if so much, as the incumbrance on it when it was conveyed to the trustees· Hemstreet has paid or given nothing to entitle him or his grantee to the land free from this incumbrance. Neither he nor Gardner ever paid anything to release the land. If Gardner had no power to convey the land in satisfaction of the mortgage, and Hemstreet has never satisfied it, then the land is still subject to the mortgage, as it was never satisfied. We could never hold that the release, executed as it was, would discharge the mortgage, if the trustees acquired no title by the conveyance. If they received nothing there would be no consideration, and consequently no release or satisfaction, and any person taking the land would do so subject to the mortgage.

We, however, think the evidence justifies the inference that

Hemstreet was fully paid the consideration for which this release was executed. He says, without giving any explanation of the manner, that the notes he gave the Gardners were fully settled and adjusted in a proper and legitimate way and upon good consideration; that the matter was arranged, settled and adjusted at the time of making their other settlements. D. B. Gardner testified that he sold some of the lands under the power of attorney and sent the deed to his principal to execute, and the amount received was, he thinks, $2000, and gave up notes to Hemstreet corresponding in amount. Now, this is the amount of the money specified in the release of the trustees to Hemstreet and the Gardners, and failing to state what lands, or to whom they were sold, we are warranted in the belief that this was the sale to the trustees. Neither he nor Hemstreet inform us how their transactions were settled, and if the sales between them were, as they say, *bona fide,* it is singular that the latter would lose, on reconveying the property, over $11,000, and neither of them should give any explanation of the matter. Hemstreet seems to have but little knowledge of the transaction, and D. B. Gardner's recollection is defective. But it is almost incredible that Hemstreet would suffer such a loss on these lands and permit D. B. Gardner to hold this $2000. We must suppose that it was taken into the account on their settlement, although D. B. Gardner says it was not. But we are constrained to believe he is mistaken. Otherwise, how can the conduct of Hemstreet be accounted for in paying no taxes, making no inquiry about the lands for such a length of time, and then selling them for a nominal sum? He says he did not desire to make any other than a quitclaim deed to Spencer. And why? Because he had no faith in his title. His evidence is vague, loose and unsatisfactory, and that of D. B. Gardner is indefinite, uncertain, and, from want of memory, not convincing. We think, when all the circumstances of the case are considered, that the fair conclusion is, that the Gardners gave, and Hemstreet received, a credit on his notes for the $2000, the

consideration of the conveyance to the trustees and their release to the Gardners.

Again, on the day this release was executed, the Gardners released these lands from the mortgage they held against Hemstreet. Now, this would seem to be strong evidence that the arrangement was made with full concurrence of Hemstreet. There is no explanation given of this release. These things all have the appearance we would expect them to assume had Hemstreet been present and consenting to the arrangement, and we must conclude, that as this release was on record as well as the conveyance from Gardner and the release from the trustees, Hemstreet must have known the fact, and if so, he has acquiesced in the arrangement so long that an innocent purchaser must be protected.

We are, therefore, clearly of opinion that the evidence shows that Hemstreet had no title to convey and Spencer acquired none by the deed from the former to him.

Again, Scott, or his grantee, the appellee, was not bound to inquire and learn whether Gardner, the attorney in fact, had misapplied the purchase money or had sold the land of his principal to pay his own debt. If the deed and release were examined, the purchaser would suppose that the arrangement was made by Hemstreet's full concurrence, because it recites that the $2000, the consideration for the release, was paid by Hemstreet and the release was to him and the Gardners. In this, the abstract, for some reason, is not full, as it only states the Gardners were released. There is nothing in the deed or release which would excite suspicion that Hemstreet had not received the consideration for the conveyance of these lands to the trustees, and even if they were, under the circumstances, bound to see that the money was paid over to Hemstreet, a guaranty from them, without notice, to put him on inquiry, would not, and purchasing in good faith, he will be protected,

The evidence fully supports the decree and it is affirmed.

*Decree affirmed.*