VAN INWEGEN v. PORT JERVIS, M. & N. Y. R. CO.

(Supreme. Court, Appellate Division, Second Department.    June 6, 1899.)

RAILROADS—FIRES—SUFFICIENCY OF PLAINTIFF'S TITLE.
 Plaintiff, suing for damages from a fire started by defendant railroad company, sufficiently establishes a legal title to the property involved, where, in addition to a paper title, he showed actual possession and acts of ownership for a considerable time, under a contract of purchase.

Appeal from trial term, Orange. county.

Actions by Samuel J. Van Inwegen against the Port Jervis, Monticello & New York Railroad Company to recover for property destroyed by fire from defendant's engines.    Judgment for plaintiff, and defendant appeals.    Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Schuyler C. Carlton, for appellant.

C. E. Cuddeback, for respondent.

PER CURIAM.    These actions were tried upon substantially the same pleadings, and upon the same theory, and with nearly the same evidence, as those of the two cases of Van Inwegen v. Railroad Co., 34 App. Div. 95, 53 N. Y. Supp. 1025, and it would serve no other purpose than to incumber the reports to go into a discussion of the points raised.    There was evidence which fairly sustains the verdict of the jury upon all of the questions submitted, the learned court delivering a charge which was clearly as favorable to the defendant as it had any reason to expect, and it is not clear that any considerations of justice would be advanced by a reversal of the judgments.

The point urged by the defendant that plaintiff failed to establish a legal title to the property involved does not appear to be well taken, as it appears that the plaintiff, in addition to a paper title, was in the actual possession of the property, and had exercised acts of ownership for a considerable time, under a contract of purchase.    The case at bar presents a very different state of facts from that found in the case of Miller v. Railroad Co., 71 N. Y. 380, and the rule there laid down has no application to the facts now before this court.

The judgments and orders appealed from should be affirmed, with costs.

---

(39 App. Div. 617.)

BARBER ASPHALT—PAV. CO. v. STANDARD ASPHALT CO.

(Supreme Court, Appellate Division, First Department.    April 14, 1899.)

1. CONTRACTS—CONSTRUCTION.
 A clause in an agreement between two asphalt companies, one of which is going out of business, and agrees to buy of the other, by which the former is allowed to "sell land asphalt for the purpose of laying sheet pavement for the period of one year from the date hereof," in certain cities, means that said asphalt may be sold for the specified use in the specified cities for one year, and not that it may sell only such asphalt as may be used by the purchasers in one year in paving in said cities.

**2. Same—Time.**
A clause in a contract providing that the defendant company may sell certain asphalt within one year includes an executory contract of sale by which it agrees to sell, although the delivery is fixed beyond the year.

Appeal from judgment on report of referee.

Action by the Barber Asphalt-Paving Company against the Standard Asphalt Company for breach of contract. From a judgment on the opinion of the referee, plaintiff appeals. Affirmed.

The following is the opinion of the court below (HAMILTON ODELL, Referee):

The plaintiff imported and sold lake asphalt, and the defendant imported, refined, and sold land asphalt, both from the Island of Trinidad. They were business competitors in the markets of the United States. In January, 1893, they entered into an agreement by which the plaintiff agreed to sell and deliver to the defendant such quantities of crude asphalt from the Trinidad Pitch Lake as the defendant might require for the fulfilling of its contracts made or to be made with certain parties for supplying them with lake asphalt for laying or repairing asphalt pavements in specified cities and towns, including the city of Syracuse. The defendant agreed to purchase its supplies exclusively from the plaintiff, "and to sell its supplies so purchased for use in laying only sheet asphaltum pavements, sidewalks, and floors" in the cities and towns referred to. The sixth clause of the said agreement was as follows: "The Standard Company also agrees not to sell or supply asphalt to any person, firm, or corporation that does not agree to deal, and deal exclusively, in asphalt obtained from the Barber Company, by or through Standard Company, without the consent of the Barber Company; and the said Barber Company consents and agrees that the Standard Company may sell land asphalt for the purpose of laying sheet pavement for a period of one year from the date hereof, such pavement to be laid only in the cities of Syracuse, Cincinnati, and Troy, and its suburbs; otherwise subject to all the other provisions of this agreement." The proper construction of this clause is the matter in controversy between the parties. The plaintiff contends that the permission granted to the defendant is not a permission to "sell" land asphalt for a year following the date of the agreement, but only a permission to sell "for use" within the year; that is, a permission to sell provided the asphalt sold should be used within the year, or, as the learned counsel puts it, "The use of the defendant's land asphalt for paving in Syracuse was limited to pavements laid within one year from the date of the contract, to wit, during the calendar year 1893." And, as part of its cause of action, the plaintiff alleges that during the period of one year from the date of the agreement the defendant, in violation of its covenant, sold land asphalt for the purpose of laying sheet pavement in the city of Syracuse in the years 1894 and 1895. The defendant, on the other hand, contends that under the agreement it had for a year the right to sell land asphalt for a certain use in certain specified localities; and this, it seems to me, is the true construction of the clause in question.

At the date of the agreement (January 2, 1893) the defendant had on hand a large stock of both refined and crude land asphalt, amounting, according to the defendant's witness Whitney, to 5,500 tons of refined and 1,200 tons of crude; and, according to the plaintiff's witness Brackett, to 3,000 tons of refined and 500 tons of crude. It is said that there is no evidence that the plaintiff had knowledge of this fact. The testimony of Mr. Blackwell shows that the large quantity of land asphalt held by the defendant was the subject of discussion before the agreement was signed, and the presumption is almost irresistible that during the negotiations which preceded the agreement the condition of the defendant, as to stock on hand, was made known to the Barber Company. All the circumstances and the terms of the agreement suggest this. The defendant was arranging to abandon its traffic in land asphalt. By the agreement it bound itself "to purchase its supplies of asphalt * * * exclusively from the Barber Company"; and it also agreed "not to sell or supply asphalt to any person, firm, or corporation that does not agree to deal,

and deal exclusively, in asphalt obtained from the Barber Company by or through Standard Company." It can hardly be doubted that the Barber Company's consent that the defendant might "sell land asphalt for the purpose of laying sheet pavement for a period of one year" from the date of the agreement was granted to give the defendant a fair opportunity to rid itself of its stock on hand. It was certainly of little value, if the plaintiff's contention that the defendant "could sell land asphalt for all pavements laid within the year 1893, and not otherwise," is correct. That construction would impose upon the defendant a guaranty that all land asphalt sold by it would be used by the purchaser within the year. If, for any cause, the work for which it was sold should be interrupted and delayed, and completion thereof during the year be prevented, the use of the asphalt by the purchaser at a later date to complete the work would be a violation by the defendant of its agreement with the plaintiff; and the plaintiff would thereby become entitled to declare the agreement at an end, under the right reserved in the eleventh clause. The defendant therefore could not with safety sell any portion of its stock on hand, for it could not possibly foresee what obstacles might prevent its use during the year. The interpretation put upon the agreement by the learned counsel for the plaintiff seems to me to be a strained and unreasonable one, and contrary to the evident intention of the parties. That intention was that the defendant, during a defined period, to wit, during the year following the date of the agreement, should be free to make sales of its stock of land asphalt for a specific purpose, to wit, for laying sheet pavements in designated localities, to wit, the cities of Syracuse, Cincinnati, and Troy. It is visible, I think, on the face of the agreement, and argument cannot make it plainer. Even if there were doubt about it, the plaintiff, being the author of the agreement, cannot claim to have its obscure clauses construed liberally in its own favor. The "rule of grammar" to which counsel refers was rather harshly treated in Smith v. Robson, 148 N. Y. 252, 42 N. E. 677. In that case the contract was between a theatrical manager and an actor, and contained this provision: "The said J. R. Smith [the actor] further agrees that if, at any time, Stuart Robson [the manager] shall feel satisfied that he is incompetent to perform the duties which he has contracted to perform in good faith, or is inattentive to business, * * * then he [Robson] may annul this contract by giving two weeks' notice to said J. R. Smith." Andrews, C. J., said: "There is a little obscurity as to the application of the qualifying words 'in good faith,' but we think it is sufficiently plain that they were intended to apply to the conduct of the defendant, as if the contract had read, 'if in good faith the employer shall be satisfied.'" So the force of the argument of counsel, based on the absence of a comma after "sheet pavement," in the sixth clause of the agreement, is badly shaken, at least, by Grinnell v. Kiralfy, 55 Hun, 422, 8 N. Y. Supp. 623, which was the case of a contract between manager and actor very similar to that in Smith v. Robson. Judge Barrett said: "The defendant [the manager] contends that as there was no comma, in the original instrument, after the word 'contracted,' the good faith referred to was his in making the contract. The plaintiff, on the other hand, claims that the words 'in good faith' refer to the previous expression, 'shall feel satisfied,' and that thus she was protected from a capricious or arbitrary discharge. We think the latter is the fair and reasonable construction of this contract."

In the second place, the plaintiff claims that the land asphalt mentioned in the complaint was not "sold" by the defendant within the limited time; that is, during the year 1893. The argument is that the words "may sell," in the sixth clause of the agreement, are used in their "plain, ordinary, and popular sense" (which is probably so); that they mean "may make sales;" that a sale is a transaction between two parties by which title to property passes from one to the other; that title does not pass by an executory contract of sale; that such contracts are not, therefore, intended or permitted by the "may sell" of the agreement; and that the defendant made no sales, but only executory contracts of sale, of the land asphalt in question. My opinion is that this claim ought not to be sustained. The facts are that in January, March, and August, 1893, contracts were made between the defendant and the Syracuse Improvement Company for the sale and purchase of sufficient quantities of land asphalt to pave and keep in repair certain streets in the city of Syracuse,

such asphalt to be delivered and accepted before dates mentioned in said contracts (some before July 1, 1893; some before November 1, 1893; some before June 1, 1894; some before September 1, 1894; and the remainder during the years 1894 and 1895), and that the 2,861 tons of asphalt referred to in the complaint were delivered by the defendant under the said contracts, and were actually used in pavements in 1894 and 1895. The dates of the deliveries have not been shown. When a sale is defined as "a transfer of the absolute title to property for an agreed price" (Story, Sales, § 1), or as a "meeting of minds, by which a title passes from one and vests in another" (Butler v. Thomson, 92 U. S. 415), the definition covers or includes the entire transaction, which, from being executory, has become executed by delivery, or payment, or performance of conditions, or separation or identification and appropriation of the thing sold, or other act or event on which the transfer of title is, by the agreement of the parties, made to depend. The question whether a transaction is a sale by which title has passed to the purchaser usually arises either on a claim asserted by a third party, as in Hatch v. Oil Co., 100 U. S. 124, where the property was seized under execution as the property of the seller, or, as in Manufacturing Co. v. Edwards, 29 Hun, 509, and Pinckney v. Darling, 3 App. Div. 553, 38 N. Y. Supp. 411, where the property was seized under process as the property of the buyer, or when, before actual delivery, the property is destroyed or damaged, as in Olyphant v. Baker, 5 Denio, 379; Terry v. Wheeler, 25 N. Y. 520, where the barley and lumber were destroyed by fire; Burrows v. Whitaker, 71 N. Y. 291, where the logs were swept away by a flood; Mee v. McNider, 109 N. Y. 500, 17 N. E. 424, where the cocoa was damaged while in transit from the port of shipment. It is, however, matter of common knowledge that in ordinary, everyday transactions the distinction between a sale that passes title, and an executory contract of sale, is not heeded or observed. If goods are sold, to be delivered and paid for at a future time, business men describe the transaction, and properly describe it, as a sale. In the Century Dictionary "sale" is defined as follows: "In law, a contract for the transfer of property from one person to another for a valuable consideration. * * * It is also often used as indicating a present transfer, as distinguished from a contract to transfer at a future time, which is sometimes termed an 'executory sale.' " In Decker v. Furniss, 14 N. Y. 611, the contract stated, "Brown sells to Furniss," etc. Judge Comstock said that the language imported an executed sale, but that phrases of that sort are used in a very loose sense and are quite inconclusive, and that "their literal signification is often overruled by the tenor and purpose of the whole instrument"; and Judge Wright added, "An adherence to the literal purport of the word 'sells' would overrule the intention which the provisions of the agreement, as a whole, plainly indicate." It is plain to me that the words "may sell" were not used by the plaintiff, in the sixth clause of the agreement, in any other than the ordinary sense, and that the plaintiff did not thereby intend to restrict the defendant to sales of land asphalt by which title would at once or presently pass to the purchasers. They intended "sell," in the sixth clause, to have the same meaning as the same word in the fifth clause, and it would certainly be absurd to say that by the fifth clause the defendant is prohibited from contracting to sell for future delivery asphalt purchased by it from the plaintiff.

The defendant should have judgment dismissing the complaint, and for the counterclaims.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

Edward Wells, Jr., and Avery D. Andrews, for appellant.
Edgar J. Nathan, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of the referee.