[Civ. No. 491. Third Appellate District.—September 22, 1908.]

F. P. BACON, Respondent, v. E. B. DAVIS, Appellant.

VENDOR AND PURCHASER—CONTRACT OF SALE—ORDINARY AUTHORITY TO REAL ESTATE AGENT TO SELL—FINDING OF PURCHASER.—The ordinary written authority from the owner of land to a real estate agent to sell the same merely imports authority to find a purchaser ready and willing to contract with the owner for the sale thereof, and carries no authority to bind the owner by a contract of sale, if no such authority is expressly conferred.

ID.—EXPRESS AUTHORITY TO BIND OWNER BY CONTRACT OF SALE—SPECIFIC PERFORMANCE.—When the owner expressly authorizes the agent to sell for him, and in his name, land of the owner, described, upon specific terms set forth, and expressly agrees to convey the same by a sufficient deed to any purchaser obtained by the agent, the agent is authorized to execute a contract of sale in the owner's name, the specific performance of which may be enforced by the purchaser.

ID.—CONSTRUCTION OF CODE—AGENT THEREUNTO AUTHORIZED.—In the concluding language of section 1741 of the Civil Code, requiring an agreement for the sale of real property to "be in writing and subscribed by the party to be charged, or his agent, thereunto authorized, in writing," the word "thereunto" has the ordinary meaning of "to that," which is an elliptical expression for the phrase

"to do that," and, so far as the agent is concerned, the language imparts that he must be authorized in writing "to do that," viz., to execute an agreement of sale which shall bind the owner.

ID.—CONSTRUCTION OF CONTRACT AS TO AUTHORITY OF AGENT.—In construing a contract to determine the authority conferred upon an agent to execute a contract of sale, its language, measured according to the established rules of interpretation, must fairly import and clearly reveal the intention of the owner specifically to empower the agent to enter into a contract of sale of the property in the ordinary acceptation of that term.

ID.—WORDS IMPORTING AUTHORITY, "FOR ME, IN MY NAME."—The words "for me, in my name," convey the idea of selling for the principal, and by his authority, as representing the principal in contracting to sell the land, with power to bind the principal.

ID.—CONFIRMATION OF AUTHORITY—AGREEMENT TO CONVEY.—The agreement to convey to the purchaser deprived the owner of the right to decline to execute a deed, and operated as an agreement to ratify and confirm the sale to any purchaser that the agent may contract with for the sale of the owner's property.

ID.—DETAILS OF TERMS OF SALE.—The details of the terms of sale, leaving nothing to be supplied by the owner, point strongly to the conclusion that it was designed to authorize the purchaser to execute a contract of sale.

ID.—RIGHT OF PURCHASER TO ENFORCE CONTRACT—BENEFIT OF PURCHASER.—When an owner promises to convey to any purchaser who might be secured by his agent, the contract by him is made for the benefit of such purchaser; and there is no merit in the contention of the owner that the purchaser cannot enforce specific performance of the contract on the ground that it was not made for his benefit. It was not necessary that the purchaser should have been named in the presence of the owner.

APPEAL from a judgment of the Superior Court of Alameda County. W. H. Waste, Judge.

The facts are stated in the opinion of the court.

A. A. Sanderson, Reed, Black & Reed, and John Garber, for Appellant.

Powell & Dow, and Snook & Church, for Respondent.

Snook & Church, Charles S. Wheeler, and J. F. Bowie, *Amici Curiae*, for Respondent, on Petition for Hearing in Supreme Court.

BURNETT, J.—The importance of the principle and the value of the property involved justify a somewhat extended consideration of the transaction out of which has grown this litigation.

The action was brought to determine the validity of an adverse claim made by the appellant, defendant Davis, to certain real property on Broadway street, in the city of Oakland. Davis claims to have purchased the property, and in his amended answer and cross-complaint he sets forth the basis of this claim as resting in: First, a contract between plaintiff and the Laymance Real Estate Company, by which the said company was authorized to sell the property, and secondly, a contract of sale made by said company with the defendant. The prayer is that plaintiff take nothing by the action and that defendant have a decree of specific performance of said contract and for general relief.

The plaintiff interposed a general demurrer to the amended answer and the amended cross-complaint. Each demurrer was sustained, and thereupon, in due time, a judgment was entered for plaintiff as prayed for in the complaint, quieting his title as against any claim of said defendant.

From this judgment the appeal is taken.

The said contract between the plaintiff and the Laymance Real Estate Company, as far as material to the present inquiry, is as follows:

"Oakland, Cal., March 31, 1905.

"In consideration of securing the services of Laymance Real Estate Company, a Corporation, and efforts on its part, and at its expense to obtain for me a purchaser for the property hereinbelow described, I hereby authorize said Laymance Real Estate Company exclusive right to sell for me, in my name and receipt for deposit thereon, for a term of sixty days from date hereof and until I give said corporation ten days' notice in writing to cancel this authorization, the following described property,—(describing it) for the sum of $135,-000.00 net to me on the following terms, to wit, 20 per cent cash on the delivery by me of a good and sufficient deed; balance to be paid as follows: one note for $72,000.00 payable in one year after date, with interest at 7% per annum secured by a trust deed to the 151 feet on Broadway by uniform depth of 100 feet; one note for $36,000, payable one year after date with interest at 7% per annum, secured by a trust deed to all

the balance of the land in said block 261 above described in the name of the Bacon Land and Loan Company.

"And I hereby agree to sell and convey by a good and sufficient grant, bargain and sale deed of conveyance and give the usual covenants therein to any purchaser obtained by said Laymance Real Estate Company, a Corporation, and if sale is made, 15 days to be allowed to search title to said property.

"And I hereby agree that said Laymance Real Estate Company, a Corporation, may retain all over said net sum for which they may sell said property as its expenses and said commission for services rendered.

(Signed)          "F. P. BACON.

"Witnessed by M. J. LAYMANCE."

The contract between the Laymance Real Estate Company and defendant Davis provided as follows:

"Know all men by these Presents: For a valuable consideration the receipt of which is hereby acknowledged by the Laymance Real Estate Company, a corporation, the duly accredited agent and on behalf of F. P. Bacon, the owner of the property hereinafter described, Elliott B. Davis hereby buys and the said F. P. Bacon by his duly accredited agent, the said Laymance Real Estate Company, hereby sells to said Davis, the said real property for the sum of $135,000.00, and the said Davis hereby deposits on account of said purchase price the sum of $5,000.00; the said sum of $135,000 to be paid as follows: [The terms here set out are the same as in the said contract between Bacon and the Laymance Real Estate Company.] "This agreement of sale is made in accordance with that certain written authorization dated Oakland, California, March 31, 1905, and signed and executed by said F. P. Bacon, authorizing the said Laymance Real Estate Company, a corporation, to sell said land for and in the name of said Bacon and to receipt for a deposit thereon and which said written authorization is recorded this first day of December, 1905, in the office of the County Recorder of the County of Alameda, and to which said authorization and the record thereof in said Recorder's office reference is hereby made for a more particular statement of the matters and things set forth therein." Then follow the description of the property and the signature of the parties.

There is no claim by appellant of ratification of said sale by plaintiff; on the contrary, it is alleged in the answer that when said plaintiff was informed of said sale he repudiated it, "and still repudiates the said contract and agreement for the sale and purchase of said property, and has ever declined and still declines to perform the covenants and provisions of said contract for the purchase and sale of said property, or any of them."

The whole case, it will be seen, therefore, virtually hinges upon the construction of the terms of the said contract between Bacon and the Laymance Real Estate Company. It is not disputed that the agent had no authority to sell the property so as to bind the owner unless the authority is found in the terms of said written authorization. Indeed, both parties cite and rely upon section 1971 of the Code of Civil Procedure and section 1741 of the Civil Code to fortify their claims. It is sufficient to quote the latter, which provides that "No agreement for the sale of real property, or of any interest therein, is valid unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or his agent thereunto authorized in writing." Some verbal criticism of the word "thereunto" is indulged by counsel, but its meaning seems altogether free from doubt. In simple language, the section provides substantially that any agreement for the sale of real property to be valid and binding must be subscribed either by the owner of the property or by his agent who has been authorized in writing by said owner to enter into such an agreement. The word "thereunto" has its ordinary signification of "to that," and is obviously an elliptical form of expression for the phrase "to do that." Hence, as far as the agent is concerned, he must be authorized in writing "to do that"; in other words, to execute an agreement of sale, to make it binding and operative.

There is no escape from the proposition that in order to determine the extent of the agent's authority we must look to the terms of the instrument as they have been employed by the parties thereunto. Unless the Laymance Real Estate Company by said agreement of March 31, 1905, was expressly authorized to enter into a contract of sale of said property, then the owner had the right to repudiate as unwarranted the contract between said agent and the defendant Davis of

December 1, 1905. It is not a question of express or implied authority. The fair import of the terms used, measured according to the established rules of interpretation, must clearly reveal the intention of the owner specifically to empower the agent to enter into a contract of sale of the property, in the ordinary acceptation of that term, or else the case of the defendant must fail. Of course, no one could reasonably contend that any particular formula of words is required to convey such authority, that the owner must say, for instance, *in haec verba*, "I authorize you as my agent to enter into an executory contract of sale," but the language used must reach the same measure of potency when tried by the recognized standards, and must positively authorize that very act.

It is not denied that in our efforts to reach the intention of the parties to said instrument we must invoke the ordinary rules for the interpretation of contracts. For instance, "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." (Civ. Code, sec. 1638.) "The whole of a contract is to be taken together so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, sec. 1641.) "The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ. Code, sec. 1644.)

Taking up, then, the contract in question "by the four corners," and viewing it in the light of these familiar rules of interpretation, what authority is conferred upon the Laymance Real Estate Company in relation to the property therein described? In the first place, it must be obvious that if the words are to be understood in their ordinary and popular sense, and if effect is to be given to all of them, the said realty company did not exceed its authority in entering into a contract of sale. There can be no doubt what the average man would understand from this language: "I hereby authorize said Laymance Real Estate Company exclusive right to sell for me in my name . . . and I hereby agree to sell and convey by a good and sufficient grant, bargain and sale deed of conveyance and give the usual covenants therein to any purchaser obtained by said Laymance Real Estate

Company." It would be difficult to select more apt words, if their ordinary signification is to be regarded, to clothe the agent with ample authority to do what was done here. This is apparent from the definition in the Civil Code of the term "to sell." Its corresponding noun "sale" is defined in section 1721 as follows: "Sale is a contract by which, for a pecuniary consideration, called a price, one transfers to another an interest in property," and what is meant by the verb is disclosed in section 1727 wherein it is provided that: "An agreement to sell is a contract by which one engages for a price to transfer to another the title to a certain thing." Therefore, in the code sense, it is clear that Mr. Bacon's language imports this: I hereby authorize said Laymance Real Estate Company exclusive right "to transfer to another the title" to said property.

But the expression "to sell" is sometimes used in the sense of an executed contract of sale, or an agreement to sell as defined by the code. (*Barber Asphalt Paving Co.* v. *Standard Co.*, 39 App. Div. 617, 58 N. Y. Supp. 408; *Rice* v. *Mayo,* 107 Mass. 550.) It has also a peculiar and restricted meaning acquired by usage wherein it signifies to obtain a purchaser ready, willing and able to buy, and it is the contention of respondent that in this last sense the term was used by the parties to said contract of March 31, 1905. It is urged that "the language is that usually found in contracts between owners of property and real estate agents, when the former list property with the latter for sale, and there is nothing to indicate that the parties to the contract in question intended anything further than that the real estate broker was given the exclusive privilege for a limited period of finding for plaintiff a purchaser. At the very outset of the authorization it is stated that the broker is to make efforts 'to obtain for me (plaintiff) a purchaser,' that is to say, the service of the broker was to consist in obtaining a purchaser, not in disposing of the property. . . . When the defendant contends that the broker's authority 'to sell' carries with it the power of making a contract of sale enforceable by a proposed purchaser, he overlooks the code provisions of this state and 'also decisions of the courts of last resort, not only in California, but also in other states."

We have already noted the code provisions to which he refers. We proceed to the consideration of some of the cases,

as typical of the long list which is cited, illustrating this special and restricted use of the term *sale.*

In *Brandrup* v. *Britten,* 11 N. D. 376, [92 N. W. 453], the court said: "The trial court held that as a matter of law the real estate brokers had not authority to sign the contract of sale, and that the defendant (owner of the property) is not bound thereby. This conclusion is sound and must be sustained. In this state it is essential to the validity of a written contract for the sale of real property signed by an agent that the authority of the agent to sign the same shall be embodied in a writing subscribed by the principal." (Citing, as said by respondent, sec. 3887, Revised Code, which is the same as subd. 5, sec. 1624, of our Civil Code, and said sec. 3960, Revised Code, which is the same as our said sec. 1741 of the Civil Code.) "It is well settled that the agency of such persons is limited to finding purchasers who are acceptable to vendors . . . and in the absence of express authority, does not extend to signing contracts of sale . . . in behalf of the principals. . . . A real estate broker may be given authority to execute contracts for his principal, but it is an additional authority. The instrument under consideration does not confer any such additional authority. It merely grants to the real estate broker 'the sale' or the selling of the land for a limited period, and for the guidance of such brokers it states the total net sum which the principal will accept and the amount of cash payment which he will exact in case of a sale—as will be seen by an examination of the instrument, the details essential to the consummation of a sale are omitted. It does not provide the length of time the deferred payments are to run, or how they are to be divided, or as to the rate of interest to be charged, or as to whether a deed shall be given to the purchaser and a mortgage to secure the deferred payments, or as to whether any deed shall be executed prior to the full payment of the purchase price. These omissions tend strongly to show that it was the intention of the parties to the instrument that the sale was to be approved and the contract of sale executed, by the principal, and not by the broker."

A leading case upon the question, cited with approval by many courts, is *Duffy* v. *Hobson,* 40 Cal. 240, [6 Am. Rep. 617]. It appears that the contract of sale there was executed by one Atkins as agent of Hobson and in the name of the latter, the owner of the property. The only testimony as to the

authority of the agent was his testimony that Hobson had told him to sell the lots for $2,000. He accordingly sold them to plaintiff for that price and executed in the name of Hobson a contract in writing to convey. The agent then sent a telegram to Hobson, informing him of what he, the agent, had done. Hobson disavowed the transaction and suit was brought for specific performance. The court held that the authority of Atkins to sell the property was not sufficient to authorize him to execute the contract of sale to Duffy, but was a mere authority from Hobson to obtain a purchaser at the price of $2,000. At that time the present statute of frauds was not in force, and hence the verbal authority was of equal force to a similar written one now. In the discussion it is said: "This is the settled construction put upon employment of professional brokers 'to sell' or 'to close a bargain' concerning real estate, and we know of no reason why the same language employed to express the authority of any other agent 'to sell' should have a more extended meaning. Besides, a sale of real estate involves the adjustment of many matters in addition to fixing the price at which the property is to be sold. The vendor may be unwilling to deal with a particular proposed purchaser on any terms. He may consider him pecuniarily unable to comply with the contract, even if the title prove satisfactory, and he may decline to bind himself to convey to such purchaser at the end of the time necessary to examine the title, because he might thereby in the meantime lose an opportunity to sell to some other person who might desire to purchase, and in whose good faith and ability to pay he reposed entire confidence. All these and many other like considerations might, and usually do, arise in the mind of the vendor. Now, a mere authority to sell can hardly confer power upon the agent to determine all these matters for his principal so as to bind him by his determination." The court concludes that "while it is true that a power to sign the name of a principal to the contract may be given verbally, we think that the words used for the purpose should be distinct and clear in their meaning and import, and should, with a requisite degree of certainty, manifest the intention of the principal to do something more than merely to employ a broker."

In *Armstrong* v. *Lowe*, 76 Cal. 616, [18 Pac. 758], the language used was: "You are hereby authorized to sell my prop-

erty and receive deposit on same (describing it) for the sum of $200.00 per acre cash. I hereby agree to pay you the sum of 5 per cent for your services in case you effect a sale, or find a purchaser for same, or will pay you 2½ per cent of above commission should I sell the same myself, or through any other agent." The court said: "The sole question in this case is whether the real estate brokers whom the defendant employed 'to sell' certain real property had authority to execute a contract to convey. We think that upon the authority of *Duffy* v. *Hobson*, 40 Cal. 244, [6 Am. Rep. 617], it must be held that they had not, and that the case of *Rutenberg* v. *Main*, 47 Cal. 219, is not in point."

In *Grant* v. *Ede*, 85 Cal. 418, [20 Am. St. Rep. 237, 24 Pac. 890], the authority of the agent was contained in the following entry:

"San Francisco, Aug. 3, 1867.

"Mr. Wheeler Martin:

"As you stated you could get $30,000.00 for the place you occupy on Market street, if you can, we will sell at that price any time before the first day of September, 1887, and allow you 2½ per cent on said price, and if no sale is made no expense is made to us.

"Yours truly,
"WILLIAM EDE."

Martin sold the property to the plaintiff Grant for the sum of $30,000 and took a deposit from the purchaser of $500. The owner, Ede, refused to make a conveyance, and the action was brought to enforce specific performance. The court decided against plaintiff and held that Martin was simply authorized to find a purchaser who would pay $30,000, and if he did so he was entitled to the commission and that there was nothing in the writing indicating any other intention. It was said that: "The object of the writing doubtless was to fix the price which the defendant was willing to take for the land and the compensation he was willing to allow Martin for making the sale." The court calls attention to the fact as significant that there was nothing in the contract specifying the form of deed or time of payment. The question of the sufficiency of the agent's authority was discussed in *Delano* v. *Jacoby*, 96 Cal. 275, [31 Am. St. Rep. 201, 31 Pac. 290], and it is there said: "There is an apparent conflict of authority on the ques-

tion of what is necessary in a power of attorney for the sale of land to authorize the attorney to execute and deliver a deed to the purchaser. Each case must be decided upon its own peculiar circumstances." (*McNeil* v. *Shirley*, 33 Cal. 206; *Rutenberg* v. *Main*, 47 Cal. 220; *Henstreet* v. *Burdick*, 90 Ill. 444.) "As between parties to the transaction it is proper to consider the situation at the time of the execution of the letter and their intention is to be gathered from the words of the instrument by all the circumstances under which it was written and acted upon. . . . So the general rule is, that a mere authority 'to sell' in the absence of any other words or circumstances qualifying the language, would not confer upon the agent the power to determine these matters for his principal."

In *Stemler* v. *Bass*, 153 Cal. 791, [96 Pac. 809], it is said: "The ordinary authority of a real estate agent deputed to sell real estate is simply to find a purchaser, and he has no power to bind his principal by a contract of sale unless it appears that it was intended to confer such additional authority. . . . Whether or not it was intended to confer such additional authority is to be determined from the language used regarded in the light of the surrounding circumstances. . . . The case at bar is very different in its facts from *Rutenberg* v. *Main*, 47 Cal. 220, relied on by plaintiff, where it clearly appeared that it was intended by the owner to clothe the agent with authority to do generally whatever was necessary to make the proposed sale binding upon the principal."

These quotations disclose clearly that by usage the phrase "to sell" has acquired this restricted and conventional meaning, that is, to secure a purchaser, and that, standing alone, it is not sufficient to authorize the agent to enter into a contract of sale, binding the principal. They also reveal and illustrate the reason for the rule and the importance, in case additional words are used, of examining with care the whole instrument to determine the intention of the parties.

On the other hand, it is appellant's contention: "That the only construction of the contract under discussion, which is at all reconcilable with the wording of its various provisions, is one in accordance with which the language of the contract is recognized as authorizing, not only 'by fair implication,' but also 'in terms,' the making of a contract of sale 'in the owner's name.' " Thus only, it is claimed, can effect be given to the

whole instrument. It is urged that there are three portions of the contract, each indicating, and all together conclusively revealing, the intention of the owner of the property to clothe the agent with this additional authority to enter into an executory contract of sale. These are: 1. The authorization to sell *for me in my name;* 2. The stipulation to convey to *any purchaser* obtained by said company; and 3. The elaborate provisions made for the terms of sale. Appellant declares: "Interpret the contract as we advocate, and you find that these stipulations harmonize and form an intelligible combination. You find that every word and phrase is accounted for and accorded some significance, and that there is no necessity for ignoring any part of the language employed, nor of virtually striking out words inserted by the parties and substituting for them words of a totally different signification.

"Interpret the contract as respondent would have it interpreted, and you find it impossible to avoid attributing to the parties a use of language so strange and improbable that you make a new agreement for them on the theory that they did not mean what they said."

The leading case in this state cited by appellant and in line with his contention is *Rutenberg* v. *Main,* 47 Cal. 213. Rutenberg was the owner of property in San Francisco, and through his agent he sold the same to the defendant, but the latter refused to make payment when the deed was tendered. The action was for specific performance. The defense was that the agent was not authorized to sell the premises, the contention being that he had authority simply to find a purchaser. It is said in the opinion that "It is true that the power of a mere broker is thus limited, although he be employed to sell real estate, because these words are construed, with reference to the actual purpose of his employment. But if the language used, regarded in the light of surrounding circumstances, clearly shows that the agency is intended to be more extensive than that of a mere broker, the court will so find. . . . That the plaintiff intended and clearly expressed his intention that Meinecke should do more than discharge the functions of a broker is apparent from the evidence." The court then sets out the evidence as follows: "In the month of July the plaintiff, who was at Bremen, wrote to Meinecke in respect to the property in the controversy: 'If you can get a binding offer of over $50,000, I may conclude to sell at once.

In this case, please telegraph.' . . . 'If you have a good offer
I can simply confirm it by telegraph. You have a deposit
made and I will then send power of attorney.' Upon the re-
ceipt of this, Meinecke placed the lot with Maurice Dore .&
Co., brokers, for sale at fifty thousand dollars; and about the
fifth of September was informed by them that they had a
customer who was willing to pay the price demanded. Sub-
sequently, Meinecke received a letter from the plaintiff, dated
August 26th, which contained the following passage: 'You
valued Market street property at $50,000. Can the price be
got, you can close the sale. I should confirm per telegraph,
and then send power of attorney as soon as a guarantee de-
posit would have been made.' September 11th, the plaintiff
again writes, acknowledging the receipt of a telegraphic dis-
patch from Meinecke, and adds: 'I at once sent you the follow-
ing telegram: 'At $50,000 the lowest, sale confirmed.' ''

In the case of *Lyon* v. *Pollock*, 99 U. S. 668, the plaintiff
authorized his attorney in fact, B., to sell his property in
Texas. B. did not make the transfer, but placed the property
in charge of C., of which Lyon was notified. Thereupon Lyon
wrote C. as follows: ''I wish you to manage my property as
you would with your own, and if a good opportunity offers to
sell everything I have. I would be glad to sell,'' etc. C.
made a deed of the property. The court, through Mr. Justice
Field, says: ''The deed executed by C. in the name of Lyon,
though invalid as a conveyance, was good as a contract for the
sale of the property described in it, and was sufficient, there-
fore, to sustain the bill for a decree directing Lyon to make
conveyance to the grantee therein.'' It was held, further,
that the letter to Lyon was sufficient to authorize C. to enter
into a contract for the sale of the property. The court, more-
over, declares that the surrounding circumstances of that case
were strongly corroborative of the view taken of the written
instrument.

Many other cases and authorities are cited by appellant, but
we shall refer to only two or three additional ones in an
examination of the peculiar phraseology of the instrument
before us. Indeed, as the intention of the parties is to be de-
termined by the language used and the surrounding circum-
stances of each particular case, and as no case has been found
involving the same language and circumstances as those in
controversy here, we are practically without direct precedent

in construing the said instrument of March 31st. It does seem, though, as suggested by appellant, that if the plaintiff had intended to authorize the defendant simply to find a purchaser for the property and not to bind himself to convey to such purchaser, he would have used simpler terms than those found in the instrument before us. Knowing, as it is presumed he did, the meaning which usage has given to the phrase ''to sell'' when contained in a broker's contract, it is reasonable to suppose that he would have gone no further except to describe the property, provide probably in a general way for the terms of the sale and to specify the broker's commission. But the first significant departure from such a simple and certain formula is marked by the use of the words ''for me, in my name.'' These words are declared by respondent to be mere surplusage. The sale if made and whether binding upon the owner or not, it is true, would be for his benefit and by his authority. But must they not be considered in determining the intention of the owner? It is not to be supposed that they are idle words, used without purpose, adding nothing to the significance of the instrument; and they are not to be ignored in our efforts to ascertain what was in the mind of the owner at the time of its execution. In my name ''conveys the idea not only of using the name of the principal, but by his authority.'' (*State* v. *Kerr*, 3 N. D. 523, [58 N. W. 27].) Hence we have the owner declaring: ''I authorize the real estate company to sell for me, and by my authority or representing me,'' indicating additional authority to what is committed to a mere broker. It reveals an intention to give the agent a power of attorney to dispose of the land, but when considered with the other expression to which attention has been called, it harmonizes with the view that an executory contract of sale was contemplated, with the duty imposed upon the owner of consummating the sale by the execution of the conveyance—the final act in the transfer of the title. This is made clear by the provision: ''And I hereby agree to sell and convey by a good and sufficient grant, etc.''

In *Farris* v. *Marten*, 29 Tenn. 495, we have an illustration of the significance commonly attached to the words ''for me'' and ''in my name.'' The written authorization was: ''Dear Sir: I have received seventy-two dollars, rents you collected for me, for which I kindly thank you and wish you to rent it

out in the same manner and upon the same terms you would your own, or sell. One of the gentlemen wants to buy the land; he offers three dollars and fifty cents per acre, payable next christmas; if you are of opinion that it is a fair price for the land, please to confirm the contract for me; take his bond and give him a bond in my name to make a title when the money is paid." Indeed, as pointed out by appellant in the oral argument, "for me and in my name" are familiar expressions in the literature of the law and in instruments defining confidential relations, and are indicative of authority in a comprehensive and exacting sense to represent and bind the principal or owner of property.

In *Heywood* v. *Heywood,* 42 Me. 229, [66 Am. Dec. 277], it is said: "It is a general principle that no word in the contract is to be treated as a redundancy if *any* meaning, reasonable and consistent with its parts, can be given to it."

In *Haydock* v. *Steele,* 40 N. Y. 363, the authorization was: "You are authorized and empowered as agents for me to sell my property." It is said by the chief justice, speaking for the court: "I consider the instrument to be a plain, direct, unqualified power of attorney to sell the land mentioned in it, nothing more, nothing less." Assuredly, the words "to sell for me in my name" are equally as potent. In fact, without the words "in my name" the authorization here would be almost exactly the same as in the Haydock case, for the word "empowered" is a synonym for "authorized," and the words "as agents" add nothing to the significance of the expression, for they are clearly implied, and with or without them there could be no doubt as to the agency but only as to its extent. The New York case is simply this, therefore: "You are authorized for me to sell my property." Here we have the additional confirmation of authority disclosed by the phrase "in my name."

But again the owner meant something by this covenant: "I agree to sell and convey by a good and sufficient grant, bargain and sale deed and give the usual covenants therein to any purchaser obtained by said company." It certainly imposes some obligation upon the owner in reference to a purchaser that might be secured by the agent. As suggested by appellant, it is difficult to distinguish between the significance of these two clauses taken together and that of the ordinary

9 Cal. App.—7

phraseology employed in a power of attorney to sell where the owner authorizes or empowers the agent to sell the property and then adds the covenant "hereby ratifying and confirming all such sales as he may make." This is illustrated by reference to *Tyrell* v. *O'Connor*, 56 N. J. Eq. 448, [41 Atl. 674], where the court said: "Mere authority to sell, without more, does not exhibit such intent that the attorney may bind the principal to convey. But where, however, the design and terms of the power manifest an intent to give the agent authority to effect a sale and conveyance and the instrument assumes to ratify the 'bargain' he may make, it will be held to give him authority to bind his principal to convey." So here, if the owner had provided: I authorize the Laymance Real Estate Company for me in my name to sell my property, hereby ratifying and confirming the sale to any purchaser that it may secure, there would be no kind of doubt as to the authority of the agent to bind the owner to make a conveyance. There is no appreciable difference between such a covenant and the one before us. Can it be said that when the owner promises to convey to any purchaser secured by the agent he reserves the right to decline to execute a deed? To so contend is to read into the contract something that the parties have not provided. Indeed, it is in direct conflict with the express covenant of the owner. It seems clear, at least, that the ordinary mind, unembarrassed by scholastic refinement, but appreciating the significance of the simple terms employed, and scanning them carefully in view of the surrounding circumstances, would inevitably reach the conclusion from reading these covenants together that the owner clearly intended to authorize the agent to bind him by a contract of sale. The explanation by respondent of this agreement to convey is, that it is meant to describe the kind of deed which the owner would execute if he accepted the purchaser. But if this had been the purpose, it would seem probable that the description would have followed the expression "on the delivery by me of a good and sufficient deed" in a preceding portion of the contract. Again, it is said to have been incorporated for the benefit of the broker to secure his commission. But it is clear that he would earn his commissions if he secured a purchaser ready, able and willing to purchase for any price in excess of $135,000. He would be entitled to that excess.

In *Phelps* v. *Prusch*, 83 Cal. 626, [23 Pac. 1111], it is held that "the contract of a broker who undertakes to sell a tract of land is that he will find a purchaser who is ready to buy on the specified terms; and when he produces such a purchaser he performs his contract."

In *Grant* v. *Ede*, 85 Cal. 418, [20 Am. St. Rep. 237, 24 Pac. 890], where the broker was authorized to sell for $30,000, it was held that he was entitled to his commission on finding a purchaser willing to buy at that price.

In *Oullahan* v. *Baldwin*, 100 Cal. 648, [35 Pac. 310], the broker was authorized in writing to negotiate the sale of certain lands. The instrument contained the statement, "Our price for said land is $116,666.65 net to us and any amount over and above said sum for which our said agents may sell said land we agree to give them for commissions for their services." It is said by the court: "The brokers were simply authorized to negotiate a sale. Their contract was completed and their commissions earned when they produced a purchaser within the five days, willing, ready and able to purchase upon the terms stated in the contract of employment."

If it is meant to intimate that the Laymance Real Estate Company could compel a sale to protect itself, this authority must be found in the contract, and amounts to the same grant of power as that contended for by appellant. But the answer to the whole contention is that the owner solemnly promised to execute a deed to any purchaser secured by the real estate company. The language is free from doubt, and the duty of the court is plain to give effect to the covenants of the parties and not to seek to emasculate the contract by groping for some reason to conclude that its meaning is otherwise than the language clearly imports.

Again, the circumstance in reference to the terms of the sale, while not controlling, is of persuasive force in indicating the intention of the parties. The importance of this circumstance is indicated in the case of *Brandrup* v. *Britten*, 11 N. D. 376, [92 N. W. 453], by the language which we have already quoted.

The omissions as to the terms of the sale, which, in that case, are said to tend strongly to show that the sale was to be approved and the contract of sale executed by the principal and not by the broker, are supplied in the instrument before us. Hence it is fair to argue that these details being present,

they tend to show that the purpose was to authorize the broker to bind the contract of sale whenever he could find a purchaser willing to pay the price. The particularity and elaboration with which the terms of sale are recited in the instrument here leave nothing to be supplied by the owner, and point strongly to the conclusion that it was designed by the parties to authorize what was afterward done by the said real estate company.

There are, indeed, portions of the instrument in question isolated from the context that would support respondent's contention. For instance, the inducement, "in consideration of securing the services of Laymance Real Estate Company, a Corporation, and efforts on its part, and at its expense to obtain for me a purchaser," etc., and, if this had been followed simply by the authorization "to sell," appellant could not prevail. But considering the whole of the instrument, it seems to mean nothing less than "I authorize the Laymance Real Estate Company to enter into an executory contract of sale of the property described and upon the terms set out and I promise to execute to the purchaser a good and sufficient deed to said premises."

If this is the right construction of the instrument, then there can be no doubt that defendant in his answer and cross-complaint set out sufficient facts to entitle him to a specific performance of the contract. It cannot be held that the contract was not made for his benefit, and therefore he is not entitled to take advantage of it. Because it is a question of the authority of the agent to bind the principal. If it had such authority, its act was the act of the principal. "An agent authorized to sell either real or personal property may enter into a contract within the terms of his authority which will bind his principal. This is of the very essence of the authority given, viz., an authority to sell. That he can bind his principal by a formal contract is the doctrine of the books from the earliest law on the subject." (*Haydock* v. *Steele,* 40 N. Y. 363.)

It would hardly be contended that if the principal directly entered into such a contract, he could repudiate it and successfully resist an action for specific performance, assuming, as appears here, that the contract was fair and reasonable and the consideration just and adequate.

We can see no merit, therefore, in respondent's contention that the contract was not made for the benefit of Davis, and hence that it cannot be enforced by him.

But even if section 1559 of the Civil Code has any application, which provides that "a contract made expressly for the benefit of a third person may be enforced by him at any time before the parties rescind it," it would require no argument to show that when the owner promises to convey to any purchaser who might be secured, the contract was made for the benefit of such purchaser. It is said in *Chung Kee* v. *Davidson,* 73 Cal. 522, [15 Pac. 100] : "It is not necessary that the parties for whose benefit the contract has been made should be named in the contract. It must appear, however, by the direct terms of the contract that it was made for the benefit of such parties."

We cannot agree with the conclusion of the learned trial judge, and the judgment is, therefore, reversed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 19, 1908.