NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 79

No. 2017-417

| | |
|---|---|
| Stonewall of Woodstock Corp. and Accordion, LLC | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Civil Division |
| | |
| Stardust 11TS, LLC and Oliver Block, LLC | May Term, 2018 |

Robert P. Gerety, Jr., J.

Norman C. Williams of Gravel & Shea PC, Burlington, for Plaintiffs-Appellants.

Christopher W. Blanchard of Facey Goss & McPhee P.C., Rutland, for Defendant-Appellee
  Stardust 11TS, LLC.

Frank P. Urso of Reis, Urso & Ewald, PC, Rutland, for Defendant-Appellee Oliver Block, LLC.

Steven E. Ferrey, Suffolk University Law School, Boston, Massachusetts, for Amicus Curiae
  Stacy Gallowhur.


PRESENT:  Skoglund, Robinson, Eaton and Carroll, JJ., and Morris, Supr. J. (Ret.),
          Specially Assigned


¶ 1.    **EATON, J.**    During the spring of 2015, plaintiff Stonewall of Woodstock Corporation (Stonewall) entered into negotiations to buy commercial property located in Woodstock from defendant Oliver Block, LLC (Oliver Block). A written contract of sale was signed by Stonewall, but not by Oliver Block, which instead sold the land to defendant Stardust 11TS, LLC (Stardust). Stonewall sued, claiming that there was a valid contract and seeking specific performance. The trial court granted summary judgment for Oliver Block, on the basis

that any contract with Stonewall was unenforceable under the Statute of Frauds because it had not been signed by Oliver Block. We affirm.

## I. Facts and Procedural History

¶ 2. Stonewall is a Vermont corporation whose shareholders include John Ruggieri-Lam and Maria Freddura.[1] Oliver Block is a Vermont limited liability corporation whose sole member is Richard Coburn. The negotiations in 2015 were largely carried out between Ruggieri-Lam on behalf of Stonewall and Coburn, Coburn's lawyer Frank Urso, and Coburn's personal assistant Richard Sbeglia on behalf of Oliver Block.

¶ 3. On May 28, 2015, Sbeglia sent an unsigned contract of sale by email to Ruggieri-Lam, who returned it with proposed modifications. On June 2, Urso sent Ruggieri-Lam an updated unsigned version of the contract, incorporating the modifications that Ruggeri-Lam had requested, with instructions to execute and return it with a deposit of $25,000. Later the same day, Ruggieri-Lam and Freddura returned the document, which they had signed, to Urso along with the deposit check. In an email reply on June 3 Urso acknowledged receipt. On Coburn's instructions, Urso deposited the check in his law firm's trust account. But neither Coburn nor anyone else acting on behalf of Oliver Block signed the contract. In the days immediately following his return of the contract document and check, Ruggieri-Lam made several inquiries to Urso about whether Coburn had signed the contract. No representation was ever made to Ruggieri-Lam that Coburn had signed the document. Finally, on June 11, Coburn informed Stonewall that he could not go through with the negotiations as laid out in the June 2 document. During this same time, Coburn had been negotiating with another potential purchaser, Stardust. Those negotiations resulted in Coburn

---

[1] Stonewall later transferred its rights related to the deal to Accordion, LLC, a Vermont limited liability corporation of which Ruggieri-Lam and Freddura are the sole members.

signing a contract of sale with Stardust on June 10. Urso returned Stonewall's deposit money on June 26.

¶ 4. Shortly after learning of the deal with Stardust, Ruggieri-Lam and Freddura filed suit against Oliver Block in the Federal District Court of Vermont, seeking specific performance on their own contract with Oliver Block. Ruggieri-Lam v. Oliver Block, LLC, 120 F. Supp. 3d 400 (D. Vt. 2015). They asserted that the emails sent by Urso on June 2 and 3 (instructing Ruggieri-Lam and Freddura to sign and return the contract with a deposit and then acknowledging receipt) satisfied the Statute of Frauds. They also sought an attachment on the Oliver Block property. As part of Oliver Block's response, Coburn prepared an affidavit denying that he had ever made a contract with Stonewall or authorized Urso or anyone else to make one. In July, the court denied Ruggieri-Lam and Freddura's petition for a writ of attachment on the Oliver Block property, concluding that they had no reasonable chance of success on the merits under Vermont contract law. Id. at 406-09. In February 2016, the federal suit was dismissed without prejudice on plaintiff's petition.

¶ 5. Stonewall then filed this suit against Oliver Block and Stardust, alleging breach of contract and fraud, and again seeking specific performance. In September 2017, the court granted summary judgment for Oliver Block with respect to Stonewall's contract claims, holding that the June 2 purchase agreement was not an enforceable contract under the Statute of Frauds. The court denied Oliver Block's motion for summary judgment with respect to fraud, but this claim was later dismissed on a stipulated motion by Stonewall.

¶ 6. On appeal, Stonewall argues that a valid contract was formed when it returned the signed contract with the deposit on June 2, thus accepting an offer made by Oliver Block. Stonewall further contends that the Statute of Frauds is satisfied by either (1) the signed affidavit by Coburn in opposition to the petition for writ of attachment produced in federal court or (2) the two emails from Urso sent on June 2 and 3. Coburn's affidavit was part of the record below, but

was not mentioned in the trial court's decision. Oliver Block and Stardust respond that no contract was ever formed and that in any event the signed writings offered by Stonewall do not meet the requirements of the Statute of Frauds.

¶ 7. We agree with the trial court that the Statute of Frauds bars enforcement of Stonewall's claim. As a contract for the sale of land, the contract falls under the Statute, and neither Coburn's signed affidavit nor the emails from Urso meet the Statute's requirements. Because we hold that the contract is unenforceable under the Statute, we do not reach the questions of whether an otherwise valid contract was formed by offer and acceptance or whether specific performance would be the appropriate remedy for any breach.

## II. Standard of Review

¶ 8. We review a grant of summary judgment de novo, under the same standard as the trial court. Bixler v. Bullard, 172 Vt. 53, 57, 769 A.2d 690, 694 (2001). We will uphold a grant of summary judgment if we agree that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Id. (quotations omitted); see V.R.C.P. 56(a). None of the relevant facts are disputed. The issue is whether the trial court correctly applied Vermont's Statute of Frauds, and this question is solely one of law.

## III. The Statute of Frauds

¶ 9. The Statute of Frauds derives from the Act for the Prevention of Frauds and Perjuries passed by the Parliament of England in 1677, 29 Car. 2 c. 3, which remains in force in some form in almost all states, Restatement (Second) of Contracts ch. 5, stat. note (1981). It has apparently been part of Vermont law since at least 1779, when the common law of England was adopted as the law of the State. See Clement v. Graham, 78 Vt. 290, 300-04, 63 A. 146, 148-50 (1906) (discussing history of reception of English common law in Vermont). The Statute is currently codified at 12 V.S.A. § 181, which provides as follows:

4

An action at law shall not be brought in the following cases unless the promise, contract, or agreement upon which such action is brought or some memorandum or note thereof is in writing, signed by the party to be charged therewith or by some person thereunto by him or her lawfully authorized:

. . .

(5) A contract for the sale of lands, tenements, or hereditaments, or of an interest in or concerning them. Authorization to execute such a contract on behalf of another shall be in writing.

Despite the Statute's pedigree, "its rote application is not automatic," and courts should be sensitive to its "underlying purposes." In re Estate of Maycock, 2001 WY 103, ¶ 19, 33 P.3d 1114 (2001). The main purpose of the Statute is, as its name suggests, to protect parties from the enforcement of fraudulent contracts, but it also "helps to ensure that contracts for the sale of land or interests therein are not entered into improvidently." Chomicky v. Buttolph, 147 Vt. 128, 130, 513 A.2d 1174, 1175-76 (1986) (refusing to enforce an oral real estate contract).

¶ 10.    The central requirements of the Statute are (1) a signature, affixed to (2) a writing. The requirement of a signature by the party to be charged is strict. Pike Indus., Inc. v. Middlebury Assocs., 136 Vt. 588, 592, 398 A.2d 280, 282 (1979) (refusing to enforce indemnity contract memorialized in unsigned telegram).  As for what is signed, the Statute's requirements are not rigid.  The signed writing does not need to be the contract itself, just "a sufficient memorandum" of it.  First Nat'l Bank of St. Johnsbury v. Laperle, 117 Vt. 144, 148, 86 A.2d 635, 638 (1952).

¶ 11.    A sufficient memorandum is any writing that indicates the existence of an agreement on a given subject and its essential terms.  Restatement (Second) of Contracts § 131. In Laperle, for instance, this Court concluded that a receipt acknowledging a down payment for the purchase of a building, signed by the buyer under the word "Attest," satisfied the Statute.  117 Vt. at 146-47, 82 A.2d at 637.  Both the property and the price were specified on the receipt signed by the buyer.  Id.  In Dickson v. McMahan, 140 Vt. 23, 24-25, 433 A.2d 310, 311-12 (1981), the Statute was satisfied by a signed letter from the seller of property stating that he was "in

5

agreement" about the purchase price and the date of possession, despite the fact that he declined to sign the contract itself (and in fact returned a proffered deposit) because of a mistake in the name of a tenant on the property and his desire to negotiate further on timing of payment. The memorandum may also be assembled from multiple different writings, as long as "one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction." Restatement (Second) of Contracts § 132; Crabtree v. Elizabeth Arden Sales Corp., 110 N.E.2d 551, 554 (N.Y. 1953). None of the writings need to have been produced with the purpose of memorializing the contract. See Richardson v. Schaub, 796 P.2d 1304, 1310 (Wyo. 1990) (holding that Statute was satisfied by unsigned financial statement acknowledging "verbal agreement" to pay stated commission for real estate deal, when appended to signed property report filed with federal Department of Housing and Urban Development).

¶ 12. Stonewall emphasizes that the Statute is a "rule of evidence" and as such "does not make oral contracts illegal or void per se," even when relating to land. Troy v. Hanifin, 132 Vt. 76, 80, 315 A.2d 875, 878 (1974). But this means simply that it is possible for later signed writings to "make mutually enforceable [oral agreements] which, prior to that time, had been unenforceable," although not void. Id. In the absence of any signed writing, a defendant may even admit the existence of an oral contract and yet still successfully invoke the Statute as a defense against enforcement. Chomicky, 147 Vt. at 130-31, 513 A.2d at 1176.

¶ 13. Stonewall also argues that in Willey v. Willey this Court enforced an oral real estate contract without a signed writing. 2006 VT 106, 180 Vt. 421, 912 A.2d 441. We disagree with this reading of that case, which involved an oral divorce settlement in which the wife surrendered her claim to the marital home in exchange for a lump-sum payment; the husband later argued that the agreement did not satisfy the Statute of Frauds. Id. ¶¶ 5, 19. The record included both a written " 'term sheet' containing the basic terms of the agreement" and a check signed by the husband, for about a quarter of the settlement amount, with the notation "Toward Settlement." Id. ¶¶ 5-6.

6

Although we emphasized the circumstances surrounding the oral agreement as a basis for our decision, the combination of these clearly related writings was also enough to satisfy the Statute. Id. ¶ 19. Willey offers no exception to the general requirement of a writing or writings that include both the essential terms of the agreement and "a signature by the party to be charged."[2]

¶ 14. In this case, there is no doubt that the Statute applies to the alleged agreement between Stonewall and Oliver Block as a "contract for the sale of lands."[3] 12 V.S.A. § 181(5). The essential terms of the alleged agreement that Stonewall seeks to enforce were fully specified in writing in the June 2 proposed contract that was left unsigned by Oliver Block. What is required under our cases is an additional, signed writing indicating that the agreement was in fact made. We consider the candidates presented by Stonewall to satisfy this requirement in turn: first the affidavit by Coburn, followed by the two emails from Urso.

## A. Coburn's Affidavit

¶ 15. The affidavit of Richard Coburn at issue here was taken on July 6, 2015, as part of the proceedings in federal court. Although it is signed, we conclude that it is not a sufficient memorandum for the purposes of the Statute of Frauds (even when taken together with the

---

[2] Other cases cited by Stonewall for the enforcement of contracts in the absence of signed writings do not involve the sale of land or any of the other situations listed in Vermont's Statute of Frauds. See Monti v. Denton, 133 Vt. 85, 329 A.2d 646 (1974) (contract relating to payment of debt); Norton & Lamphere Constr. Co. v. Blow & Cote, Inc., 123 Vt. 130, 183 A.2d 230 (1962) (contract for purchase of crushed rock).

[3] Stonewall seems to suggest that its payment of the deposit and its hiring of an attorney to handle the transfer of title constituted partial performance that would take the transaction out of the Statute. Such an "exception to the Statute of Frauds" is recognized in Vermont, Nutting v. Freda, 153 Vt. 501, 501, 572 A.2d 896, 897 (1990) (mem.), but it requires reliance by the party seeking enforcement that results in something "beyond injury adequately compensable in money." Jasmin v. Alberico, 135 Vt. 287, 290, 376 A.2d 32, 33 (1977). The payment of the deposit thus does not take the transaction out of the statute. Id. at 290, 376 A.2d at 34 ("[M]oney payments on the purchase are not enough to give the oral agreement enforceable status . . . ."). The full amount of Stonewall's check was returned within the month. Nor does Stonewall's hiring of an attorney change matters: "activities in preparation for the proposed transfer of title" are not the kind of reliance that removes a land contract from the Statute. Towsley v. Champlain Oil Co., 127 Vt. 541, 543, 254 A.2d 440, 442 (1969).

unsigned contract), because its content does not provide the required recognition that an agreement was formed.

¶ 16. Coburn's affidavit contains the following relevant statements. Claiming that he had received offers to purchase the property from both Stonewall and Stardust, Coburn describes his next step as follows: "I asked my attorney, Frank Urso . . . , to produce contracts of sale based upon those offers and submit them to each of the prospective purchasers so that the terms of each deal could be fully negotiated and so that I could make a final decision." Coburn later received signed agreements back from both parties. He then states: "I did not accept either the [Stardust] Offer or the [Stonewall] Offer, nor did I authorize anybody else to do so." Noting that he had "serious concerns about [Stonewall's] creditworthiness," he "instructed Mr. Urso to run [Stonewall's] $25,000 check through his trust account to be sure it wouldn't bounce." After further review, Coburn finally "determined that [he] could not accept either offer as they stood."

¶ 17. A signed affidavit can, in general, provide the indication of a contract's existence required by the Statute. In Martin v. Eaton, 140 Vt. 134, 436 A.2d 751 (1981), relied upon by Stonewall, the plaintiff made an oral agreement to purchase property with the administrator of an estate, but the administrator later resigned and the oral agreement was repudiated by his replacement. The Court granted summary judgment for the plaintiff, finding that an affidavit, signed by the former administrator and "in which the terms of the oral agreement were set forth," satisfied the Statute. Id. at 135, 436 A.2d at 753. Likewise, in Roberts v. Karimi, a signed affidavit by the alleged seller of land was found to be a sufficient memorandum of a contract (in conjunction with several other documents, among them an unsigned "Memorandum of Sale" listing essential terms) because it contained the statement "Initially, I was agreeable to the terms outlined." 79 F. Supp. 2d 174, 178 (E.D.N.Y. 1999), rev'd on other grounds, 251 F.3d 404 (2d Cir. 2001); accord Bower v. Jones, 978 F.2d 1004, 1009 (7th Cir. 1992) (holding that signed deposition in which defendant described agreeing to all essential terms in unsigned draft employment contract satisfied

8

Statute under Illinois law).  In all these cases, a signed affidavit satisfied the Statute because it clearly indicated that an agreement had been made.

¶ 18.     Courts have also held that signed documents repudiating a contract can satisfy the Statute.  Sennott v. Cobb's Pedigreed Chicks, 84 N.E.2d 466, 467 (Mass. 1949) (letter cancelling contract for sale of oats, containing original order number, "was in itself a recognition of the contract and was in form a sufficient memorandum to satisfy the statute"); George Lawley & Son Corp. v. Buff, 119 N.E. 186, 186 (Mass. 1918) (defendant's letter stating that he had "changed [his] mind" about agreement to assume debt satisfied Statute); Louisville Asphalt Varnish Co. v. Lorick, 8 S.E. 8, 11 (S.C. 1888) (telegram in which defendant told plaintiff not to "ship the paint ordered" because they had "concluded not to handle it" satisfied Statute).  In all these cases, writings announcing an intention not to perform provided "written unambiguous recognition" of the contract's existence and terms.  George Lawley & Son Corp., 119 N.E. at 187.  This "unambiguous recognition" was enough to satisfy the Statute.  Id.

¶ 19.     Coburn's affidavit clearly differs dramatically from those found sufficient in Martin, Roberts, and Bower.  In those cases, the parties admitted, at least tacitly, that they had assented to the agreement at issue; Coburn by contrast states directly that he "did not accept . . . the [Stonewall] Offer" or "authorize anybody else to do so."  Coburn's affidavit also clearly differs from the repudiating documents accepted in Sennot, George Lawley & Son Corp., and Louisville Asphalt Varnish Co.  His affidavit is not a repudiation of a contract (i.e., a refusal to perform), but rather an explicit denial that any agreement was ever made; this was the purpose for which it was filed with the federal court.  The distinction between repudiation, which implicitly recognizes the original formation of a contract, and denial, which does not, is a crucial one:

> A signed writing which is otherwise a sufficient memorandum of a contract is not rendered insufficient by the fact that it also repudiates or cancels the contract, or asserts that it is not binding because not in writing.  But a writing denying the making of the contract is not a memorandum of it.

9

Restatement (Second) of Contracts § 133 cmt. c.

¶ 20. Coburn's affidavit is not a repudiation of an existing contract, or an "assertion that it is not binding because not in writing," but rather a denial that a contract was ever formed. Id. As such, it does not provide the "unambiguous recognition" of the contract that is required to satisfy the Statute of Frauds. We emphasize that the characterization of a writing as a denial rather than a repudiation for purposes of the Statute is an objective matter. We do not consider Coburn's affidavit as evidence of his subjective intentions at the time of the alleged contract, which are irrelevant both to the question of enforceability under the Statute and to that of whether there was a contract at all. As we have stated in the past, "we determine intent to be bound using an objective test," Miller v. Flegenheimer, 2016 VT 125, ¶ 15, 203 Vt. 620, 161 A.3d 524, based on the outward "words and deeds of the parties," Quenneville v. Buttolph, 2003 VT 82, ¶ 17, 175 Vt. 444, 833 A.2d 1263. A party cannot escape a contract on the basis of an unexpressed "mental reservation." Right Printing Co. v. Stevens, 107 Vt. 359, 365, 179 A. 209, 212 (1935). In the context of transactions not under the Statute, a post hoc affidavit like Coburn's would not invalidate an oral agreement to which both sides had given an outward manifestation of assent. Since the affidavit cannot satisfy the Statute, we need not consider whether the actions that Coburn describes himself as taking in it would count as such a manifestation.[4]

### B. Urso's Emails

¶ 21. In addition to the affidavit, Stonewall relies on the two emails from Coburn's attorney Urso to Ruggieri-Lam of Stonewall. We conclude that these emails also cannot supply

---

[4] Although the above considerations are enough to render any contract unenforceable under the Statute, we note in addition the evidence suggesting that there was no "meeting of the minds" and that the parties all understood this. In the record it is unclear or disputed whether Coburn himself was aware of or had approved any or all of the modified terms in the June 2 draft of the contract. Ruggieri-Lam's subsequent requests for a copy of the contract signed by Coburn moreover imply that he was aware of the importance of getting Coburn's signature for Oliver Block.

10

the signed writing required by the Statute of Frauds because Urso was not authorized in writing to conclude the sale on behalf of Coburn or Oliver Block.

¶ 22. The text of the email sent on June 2 reads, in its entirety: "Attached you will find: 1. A revised Agreement with changes shown; and 2. A revised Agreement (clean copy) for execution along with Exhibit A. Please execute and get copies back to me while mailing me the deposit check. Frank." The two versions of the agreement were attached. The second email from Urso, sent on June 3, reads, again in its entirety: "I have received the signed agreement and the deposit check for $25000." Coburn and Speglia were copied on both emails. Ruggieri-Lam responded to this second email on the same day, stating in part: "Great. Thanks for the confirmation. If you would kindly have [Coburn's] signature affixed to the P&S and circulate same, that would be great."

¶ 23. Stonewall argues that the June 2 email signed "Frank" constitutes a sufficient memorandum of the agreement, when taken together with the attached unsigned contract supplying the essential terms.[5] The Statute allows for the signature to be made by "some person . . . lawfully authorized" to do so by the party to be charged; Stonewall claims that Urso was so authorized on behalf of Coburn and Oliver Block. 12 V.S.A. § 181. The federal court held that the typed word "Frank" in the first email counted as a signature for the purposes of the Statute under the Uniform Electronic Transactions Act, 9 V.S.A. § 276. Ruggieri-Lam, 120 F. Supp. 3d at 407. The parties dispute whether this latter application of Vermont's law is correct. But even acknowledging the general prevalence and acceptance of the practice of electronic signatures, we do not need to decide the question because we conclude that there is no signed writing establishing that Urso was "lawfully authorized" to conclude the contract on behalf of Coburn or Oliver Block.

---

[5] The role of the June 3 email in Stonewall's argument is not entirely clear. Although Stonewall describes it as a "signed email," it is not subscribed by Urso or anyone else personally. It includes only the presumably automated signature giving the name of the firm ("Reis Urso & Ewald, PC") and its business address.

¶ 24. Vermont's Statute of Frauds imposes an additional requirement specifically on contracts for sale of land: "Authorization to execute such a contract on behalf of another shall be in writing." 12 V.S.A. § 181(5). We have treated this requirement strictly. Couture v. Lowery, 122 Vt. 239, 246, 168 A.2d 295, 300 (1961) (holding that sale by auctioneer was invalid under Statute because "the authority of the agent must be in writing to bind the sellers"). We know of no Vermont case that considers precisely what form such written authorization must take. However, in other states where such a statutory requirement is found, the written delegation need not be formal, but it must be unambiguous. Bacon v. Davis, 98 P. 71, 73-75 (Cal. App. 1908) (noting importance of "examining with care the whole instrument" to see if it "clearly reveal[s] the intention of the owner specifically to empower the agent to enter into a contract of sale of the property"); Comm'n on Ecumenical Mission & Relations of United Presbyterian Church in U.S.A. v. Roger Gray, Ltd., 267 N.E.2d 467, 471 (N.Y. 1971) (refusing to enforce lease signed by corporate employee because letter renewing employee's position as "managing agent" did not convey "express authority to execute documents in a determinate class of transaction").

¶ 25. Stonewall argues that Coburn's written authorization of Urso as his agent is found in the signed affidavit, because Coburn states there that he asked Urso to submit draft contracts to the various potential buyers. But this is not "evidence of the authority of an agent to sign," as is required by our law. Pike Indus., 136 Vt. at 592, 398 A.2d at 282 (emphasis added); see Fedder Dev. Corp. v. FB Hagerstown, LLC, 181 F. App'x 384, 389 (4th Cir. 2006) (holding that attorney's signature on email transmitting real estate contract was unenforceable under Maryland law because Statute requires that agent have "the authority to bind the principal to the contract, not merely the authority to deliver the contract"). Especially in light of the fact that elsewhere in the affidavit Coburn explicitly denies that he ever authorized anyone to accept an offer, the statements cited by Stonewall fall short of "clearly reveal[ing]" that Coburn authorized Urso to act as an agent for

Oliver Block.[6] Bacon, 98 P. at 73. Because neither the affidavit nor any other writing in the record meets the special requirement of written authorization imposed by 12 V.S.A. § 181(5), the June 2 email from Urso cannot satisfy Vermont's Statute of Frauds.

¶ 26. The requirements of Vermont law were not met here: Stonewall presented no document recognizing a contract and signed by Coburn or anyone else authorized by him in writing to act on behalf of Oliver Block. As such, summary judgment was properly granted for Oliver Block.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 27. **ROBINSON, J., concurring.** I agree with the majority's ultimate conclusion, but for slightly different reasons. I disagree with the majority's conclusion that the Coburn affidavit is insufficient to satisfy the memorandum requirement because in the affidavit Coburn denies having formed a contract with Stonewall. I agree, however, with the majority's ultimate determination because the Coburn affidavit does not provide the necessary signed writing with respect to the modified terms, or counteroffer, that Ruggieri now seeks to enforce.

¶ 28. Had Ruggieri-Lam and Freddura agreed to the terms of the contract emailed to them on May 28, the Statute of Frauds would be satisfied by Coburn's affidavit. My conclusion on this point rests on the specific facts of the negotiation, as well as two legal considerations.

---

[6] Because we hold that the Statute's requirement of written authorization was not met, we do not consider whether Urso was otherwise acting with Coburn's apparent or actual authority at the time of the alleged contract (a question to which Coburn's retrospective characterization of his subjective intention is irrelevant).

13

¶ 29.    The critical facts are as follows.  Ruggieri-Lam and Coburn had been negotiating for several weeks regarding Stonewall's potential purchase of Oliver Block.  On May 28, Sbeglia, acting on behalf of Coburn, emailed Ruggieri a revised contract modified in accordance with Ruggieri-Lam's discussions with Coburn earlier that week.  He wrote, "If this is in order, please attach the Schedule of Leases we sent earlier and execute the agreements.  Please send them to Frank Urso, together with the down payment check made payable to his firm.  We will attach the documents required by Schedule B (if any) upon final execution."   This appears to be the communication that Coburn acknowledged he authorized in his subsequent signed affidavit.

¶ 30.    The first relevant legal consideration is the purpose of the Statute of Frauds, and its impact on the requirements of a satisfactory writing.  The commentary to the Restatement (Second) of Contracts explains the purpose of the Statute of Frauds:

> The primary purpose of the Statute is evidentiary, to require reliable evidence of the existence and terms of the contract and to prevent enforcement through fraud or perjury of contracts never in fact made. The contents of the writing must be such as to make successful fraud unlikely . . . .

Restatement (Second) Contracts § 131 cmt. c (1981).  Given this purpose, the Restatement provides that the required writing:

> (a) reasonably identifies the subject matter of the contract,
> (b) is sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and
> (c) states with reasonable certainty the essential terms of the unperformed promises in the contract.

Id. § 131(a)-(c) (emphasis added).  The purpose of the statute is not to let people back away from agreements they have freely made when the fact of the agreement, and the associated terms, can be clearly ascertained.  It is to avoid attempts to enforce agreements that were never made in the first place.

¶ 31. The second important legal consideration, as acknowledged by the majority, <u>ante</u> ¶ 20, is that the intent to be bound, and consequent formation of a contract, is an objective matter to be assessed based on the parties' words and actions. See <u>Quenneville v. Buttolph</u>, 2003 VT 82, ¶ 17, 175 Vt. 444, 833 A.2d 1263.

¶ 32. The May 28 communique from Sbeglia on behalf of Coburn to Ruggieri-Lam and Freddura is clearly an offer, and Coburn's signed affidavit confirms that it was extended at his instance. There is no dispute about the subject matter or essential terms of the contract, and the evidence is sufficient to indicate that a contract was offered by Coburn. That Coburn was, unbeknownst to Ruggieri-Lam and Freddura, simultaneously negotiating with another party for the sale of the same property, and that he subjectively intended for the May 28 communique to be something other an offer to sell on the terms outlined in that proposed purchase and sale agreement, are irrelevant to the analysis. <u>Id</u>. ("The intent of the parties to be bound . . . is a question of fact to be determined by examining the objective words and deeds of the parties.").

¶ 33. Although the majority acknowledges this legal framework, it suggests that Coburn's affidavit is not a sufficient writing because it denies a contract was ever formed. But the formation of a contract is ultimately a legal question answered by objective evidence. Coburn does not deny in his affidavit that he authorized the May 28 communique. Had he done so, I would fully agree with the majority. That would be a denial of the facts essential to the formation of a contract. But all Coburn denied was a subjective intent to be bound by the communications he authorized. His affidavit affirmatively validates the <u>facts</u> that support a conclusion that the May 28 communication was an offer to sell to Stonewall on the terms outlined. For that reason, the Coburn affidavit would be sufficient to satisfy the Statute of Frauds if Ruggieri-Lam and Freddura had accepted the May 28 proposal.

¶ 34. I concur with the majority's conclusion because Ruggieri-Lam and Freddura did not accept that proposal, but instead countered with proposed changes in the terms concerning

15

price and the timing of a $50,000 payment. The June 2 communication from Urso back to Ruggieri-Lam incorporates those changes. I see nothing in the Coburn affidavit that expressly reflects that Coburn authorized Urso to make these changes and communicate them back to Ruggieri-Lam. Since this is the purported agreement Stonewall seeks to enforce, the absence of any writing signed by Coburn, including the Coburn affidavit itself, that reflects the essential terms and acknowledges his agreement is fatal to Stonewall's case.

¶ 35. For these reasons, I do not join in ¶¶ 15-20 of the majority opinion, but concur in the result.

_____
Associate Justice