NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 125

No. 2015-448

| | |
|---|---|
| Kenneth W. Miller, II | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| Eric Flegenheimer | May Term, 2016 |

Helen M. Toor, J.

Kevin M. Henry and Malory S. Lea of Primmer Piper Eggleston & Cramer PC, Burlington, for Plaintiff-Appellee/Cross-Appellant.

Andre D. Bouffard of Downs Rachlin Martin PLLC, Burlington, for Defendant-Appellant/ Cross-Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **REIBER, C.J.** This is an appeal from the trial court's decision on the merits. The case requires us to determine whether a series of e-mails exchanged between two business partners who jointly own a document shredding company constituted an enforceable contract to sell one partner's interest in the company to the other partner. The defendant (seller) appeals the trial court's determination that the partners had an enforceable contract and that seller is obligated to negotiate the remaining terms of the deal in good faith. He argues that there were too many open terms to produce an enforceable contract and that the partners had no intent to be bound to a contract by their e-mails. The plaintiff (buyer) cross-appeals and argues that the e-

mails do demonstrate intent to be bound and that we should enforce the contract. We reject buyer's argument that the parties had entered into a fully completed contract, agree with seller that there was no enforceable contract at all, and accordingly reverse and enter judgment for defendant.

¶ 2.     Buyer and seller are joint owners and two of three cofounders of a document shredding company (the company). Each partner currently owns half of the stock in the company. The company has been successful. The same cannot be said of its partners' working relationship. By 2010, it had become apparent to the partners that they were not working well together, so they hired an outside CEO and put in place a three-person advisory board to resolve their disputes independently. They also considered selling the company to an interested outside purchaser but could not agree on the price. The following year, the outside CEO left and seller became CEO. Buyer withdrew from day-to-day operations for both business and personal reasons.

¶ 3.     The partners then conducted months of negotiations in an attempt to include a buy-sell agreement in their shareholders' agreement. The buy-sell agreement would create a process for one partner to buy out the other. The partners engaged counsel and exchanged numerous drafts of the proposed agreement. They spent over $30,000 of company money on the effort. In the end, buyer refused to sign the final draft of the agreement, and negotiations fell apart on December 9, 2013.

¶ 4.     The buy-sell agreement drafts had several features that mirrored seller's eventual offer to buyer. These included a "claw-back provision," which provided that if one partner bought out the other and then sold the company for a higher price within two years, the partner who was bought out would receive half of the difference between the value at which he sold the company and the value his partner received when he resold it. The buy-sell agreement drafts did

2

not name a fixed price for the company, and they did not include a non compete agreement or a non solicitation agreement.

¶ 5. On December 26, fifteen days after negotiations had broken down over the buy-sell agreement, seller sent buyer an e-mail offering terms of sale for his stock in the company. In the e-mail, seller offered to sell the company to buyer at a price reflecting the average of two appraisals they had previously commissioned and also with the claw-back provision in place:

> Your decision not to sign the buy/sell agreement on the day of our last Board meeting on December 9, 2013, an agreement that the Board had endorsed and we had previously agreed to sign, has made me realize that our goals for the company are inconsistent and incompatible with each other.
>
> Accordingly, I am offering you the option to purchase my share of [the company] for a price [which] . . . reflects the average of the 2 professional appraisals we had done in the fall of 2012. I extend this offer to you in a good faith attempt to allow you to purchase the entire company with 1 condition, namely, if you sell the company within 2 years of acquiring my shares, you will agree to equally split with me all proceeds in excess of [twice the price above]. This offer will remain open until Friday, January 10, 2014 at which point it will be withdrawn.
>
> Likewise, I am prepared to purchase all of your shares on the same terms and conditions as outlined above.

¶ 6. Five days later, on December 31, buyer replied by e-mail that "I will accept" the offer, acknowledged the claw-back, and that seller should expect "definitive documents" with "customary provisions" within about two weeks:

> Thank you for your e-mail of December 26, 2013. I will accept your offer to purchase your shares of [the company] for a price of [same as proposed]. I also agree that the definitive documents evidencing this sale will contain a claw-back in the event that I sell the company within two years of the closing in excess of [twice the price above] . . . You should expect to see drafts of the definitive documents containing customary provisions for transactions of this type prior to January 10th.

3

¶ 7. On January 9, 2014, buyer sent a short e-mail to seller and attached a twelve-page Stock Purchase Agreement and a six-page Confidentiality, Non-Competition, and Non-Solicitation Agreement (Non-Compete Agreement). In the Non-Compete Agreement, seller would agree not to compete with the company or solicit employees or customers of the company for three years. The Non-Compete Agreement referred to itself as "a condition precedent" of the Stock Purchase Agreement. The agreements also lowered the price buyer offered seller for his shares by $50,000, assigning that consideration to the Non-Compete Agreement. Five days later, on January 14, seller responded that he had reviewed the Stock Purchase Agreement and Non-Compete Agreement and would be withdrawing his offer to sell his shares:

> I am in receipt of the draft Stock Purchase Agreement and Non-compete. . . . After reviewing the documents with my counsel, and after further contemplation of the terms of the sale as well as my own personal investment in the company, I have determined that it is not in my best interest to move forward with the transaction at this time. Accordingly, I am withdrawing my offer to sell my shares.

In the same e-mail, seller also told buyer that he would be stepping away from the day-to-day operations of the company by March 31.

¶ 8. Buyer brought suit against seller, requesting specific performance of the contract. Seller moved for summary judgment. The court, in its ruling on the motion for summary judgment, adopted a framework from New York law in which there are two categories of preliminary agreements: Type I and Type II. See Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987). The court defined a Type I agreement as "essentially a done deal that merely needs follow-up documentation" and a Type II agreement as "a preliminary agreement that obligates the partners to negotiate further terms in good faith." The court later used the same framework in its ruling on the merits of the case. In its ruling on the merits, the court found that buyer and seller had entered into a Type II agreement by

4

exchanging their December e-mails. It found that buyer's January 9 e-mail and draft documents constituted a proposal of additional terms that did not invalidate the original acceptance of the offer. Further, the court ordered that the partners were obligated to negotiate the remaining terms of the contract in good faith.

¶ 9. On appeal, seller argues that the court erred in its ruling on the merits when it found an enforceable contract to negotiate the remaining terms of the contract in good faith, specifically a Type II agreement. Buyer cross-appeals and argues that the court erred in not finding a Type I agreement. We conclude that there was no enforceable contract between buyer and seller and accordingly reverse the judgment for buyer.

¶ 10. We first address whether a series of e-mails exchanged between two business partners constitutes an enforceable contract, either for the terms of the contract or as a preliminary agreement to negotiate further terms in good faith. In doing so, we note that we have never adopted the New York Type I-Type II approach, and we decline to do so here. This approach would lead to courts enforcing agreements to agree, a practice we have historically approached with caution and that could lead to extensive follow-up litigation. See, e.g., Catamount Slate Prods., Inc. v. Sheldon, 2003 VT 112, 176 Vt. 158, 845 A.2d 324. When reviewing the court's analysis, we will determine whether the court considered all the factors appropriate for determining that an enforceable agreement exists under the precedent of this Court. However, we will use Type I-Type II labels when referring to the trial court's decision.

¶ 11. Our review is concerned with the "legal interpretation of whatever hazy agreement existed," namely whether there was an enforceable contract to negotiate the remaining terms in good faith, which is a question of law. Kellogg v. Shushereba, 2013 VT 76, ¶ 17, 194 Vt. 446, 82 A.3d 1121. We therefore review de novo whether there was an enforceable contract as a matter of law.

5

¶ 12. Preliminary agreements are not a novel concept. Courts have long acknowledged that there is a range of preliminary agreements, some of which are enforceable and some of which are not. See Cobble Hill Nursing Home v. Henry & Warren Corp., 548 N.E.2d 203, 206 (N.Y. 1989) ("[A]t some point virtually every agreement can be said to have a degree of indefiniteness."). On the one hand, "mere agreement to agree at some future time is not enforceable." Wolvos v. Meyer, 668 N.E.2d 671, 674 (Ind. 1996). But on the other hand, "[a] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement." Tractebel Energy Mktg. v. AEP Power Mktg., 487 F.3d 89, 95 (2d Cir. 2007) (quotation omitted).

¶ 13. Here, whether the series of e-mails constituted an enforceable contract or—instead—a preliminary agreement depends on two factors: the parties' intent to be bound and the definiteness of terms in the communications between the parties. See Meyer, 668 N.E.2d at 675 ("The question of whether an agreement is an enforceable . . . contract or merely an agreement to agree involves two interrelated areas: intent to be bound and definiteness of terms." (quotation omitted)). We therefore begin our analysis by examining whether the parties intended to be bound by their e-mails. In doing so we recognize the paramount right of each party to determine the exact moment at which it becomes bound to an agreement. See Catamount Slate Prods., Inc., 2003 VT 112, ¶ 16, ("The freedom to determine the exact moment in which an agreement becomes binding encourages parties to negotiate as candidly as possible, secure in the knowledge that they will not be bound until execution of what both parties consider to be a final, binding agreement."). This consideration is born out of the "primary concern for courts in such disputes . . . to avoid trapping parties in surprise contractual obligations that they never intended." Id.

6

¶ 14. Indeed, at oral argument, seller recognized this concern when counsel referred to contracts formed to the surprise of a party as "gotcha contracts." It is because of the danger of such "gotcha contracts" that the Second Circuit has recognized a "strong presumption" against finding a binding obligation to be bound. See Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989) ("There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." (quotation omitted)).

¶ 15. Because of this concern, we determine intent to be bound using an objective test. Evarts v. Forte, 135 Vt. 306, 310, 376 A.2d 766, 769 (1977) ("It is never enough that the parties think they have made a contract; they must express their subjective intent in a manner that is capable of understanding."). This objective test requires that intent to be bound be "established by some unequivocal act or acts." McSweeney et ux. v. Dorn, 104 Vt. 110, 114, 158 A. 88, 89 (1932). Parties can show that they intend to be bound through their words or through their actions. See Restatement (Second) of Contracts § 18 (1981) ("Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance."). Parties must show intent to be bound at the time of agreement and "[a]ssent to the formation of an informal contract is operative only to the extent that it is manifested." Id. § 18 com. a.

¶ 16. Although we review de novo whether there was an enforceable contract as a matter of law, we review the court's determination in its ruling on the merits that the partners intended to be bound for clear error because whether an intent to be bound existed is a question of fact. Quenneville v. Buttolph, 2003 VT 82, ¶ 17, 175 Vt. 444, 833 A.2d 1263 ("The intent of the parties to be bound, however, is a question of fact to be determined by examining the objective words and deeds of the parties."). We first note that the court found that the partners did intend to be bound, though it never said so explicitly in its findings, because it found in its

7

ruling on the merits that seller "flat-out accepted" the terms of the offer. However, "[i]n this case . . . the findings of the trial court contain inconsistencies flowing from a misapplication of the governing legal standards." Vaughan v. Tetzlaff, 141 Vt. 150, 153, 446 A.2d 356, 357 (1982) (reversing court's holding for clear error). Here, we hold that the court erred in determining that the partners intended to be bound.

¶ 17.  As we noted in Catamount Slate Products, Inc. v. Sheldon, in the absence of a fully executed document, we apply a four-factor test to determine whether parties intended to be bound:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

2003 VT 112, ¶ 17 (quoting Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985)).

¶ 18.  The first factor is "whether there has been an express reservation of the right not to be bound." When determining whether the partners expressly reserved the right not to be bound, we look first at the "parties' correspondence and other documentary evidence." Catamount Slate Prod., Inc. v. Sheldon, 2003 VT 112, ¶ 18. Here, the most relevant pieces of documentary evidence are the e-mails between the partners. A party's intent to be bound must be shown by his or her actions at the time of agreement. Arcadian Phosphates, 884 F.2d at 73 ("[A] party that wishes to be bound can very easily protect itself by refusing to accept language that shows an intent not to be bound."). In his December 31 e-mail, buyer makes reference to forthcoming "drafts of the definitive documents." The Second Circuit, from which we have adopted the four-factor Catamount Slate test, has found that a reference to a future writing shows an intent not to be bound. See Arcadian Phosphates, 884 F.2d at 72 ("The language of the

8

November memorandum—two references to the possibility that negotiations might fail and the reference to a binding sales agreement to be completed at some future date—shows that Arcadian did not intend to be bound."). This factor therefore weighs against enforceability.

¶ 19. Buyer argues that we cannot consider the plain language argument above because seller did not assert it at trial. However, we have found that "the preservation rule is satisfied when the court had a fair opportunity to consider, evaluate and rule upon the question raised on appeal." Vermont Built, Inc. v. Krolick, 2008 VT 131, ¶ 10, 185 Vt. 139, 969 A.2d 80 (quotation omitted). Here, the court quoted the language of the e-mails at length in its ruling and performed considerable evaluation of their contents and wording. We therefore have no doubt that the seller met the preservation rule and properly raised the argument at trial.

¶ 20. The second factor is whether there has been partial performance of the contract. As the court found and as both buyer and seller acknowledge, there was no partial performance of the purported contract. We agree with the court that "[t]his factor weighs against enforceability."

¶ 21. The third factor is whether all the terms have been agreed on. As the court recognized by requiring the partners to negotiate the remaining terms in good faith, not all the terms were agreed on here. Several large and material terms were not decided. These include whether or not the contract includes a form of non compete or non solicitation agreement, the price to be paid for the shares (as opposed to the Non-Compete Agreement), and the structure of the claw-back provision. While it is true that "not all terms of a contract need to be fixed with absolute certainty," it is also true that an agreement "in which a material term is left for future negotiations, is unenforceable." Tractebel Energy Mktg., 487 F.3d at 95 (quotations omitted). Therefore, terms left open for negotiation must be minor terms, so buyer's argument that "they are not unimportant or fine details, but also they're not . . . insurmountable" is flawed.

9

¶ 22. Buyer states on appeal that he will give in on all remaining terms and that seller can "draft [the agreement] up however [he] want[s]." Buyer therefore asks us to imply terms on the issues not discussed in the e-mails to favor seller. "To imply such terms, however, would be to impermissively make a contract for the parties rather than to enforce any bargain the parties themselves may have reached." Candid Prods. v. Int'l Skating Union, 530 F. Supp. 1330, 1335 (S.D.N.Y. 1982). Furthermore, this approach disregards the fact that a contract is formed at the time of agreement, not later, and that buyer cannot change the terms of his e-mail to reflect what he now subjectively believes they were. The parties' actions at the time of agreement must speak for themselves and be interpreted as a reasonable person would have interpreted them under the circumstances. This factor therefore weighs against enforceability.

¶ 23. "The fourth Catamount factor has two aspects: first, whether the agreement at issue is of a type that is usually committed to writing and, second, whether the agreement is so complex that the parties could not reasonably have expected to be bound without a writing." Willey v. Willey, 2006 VT 106, ¶ 18, 180 Vt. 421, 912 A.2d 441 (quotation omitted). We address the first aspect of this factor first. Since Catamount Slate involved an oral agreement, whereas here there are e-mails and draft documents, we construe this factor to ask whether this is the type of contract usually reduced to a formal writing of the type that seller contends it must be reduced to in order to be enforceable. The short answer is yes. The court likewise found that this is the type of contract that is usually reduced to a writing, and we agree. The court found that "[t]he parties agree they intended a written document to follow their emails."

¶ 24. Buyer argues that in this case, because he had other options for financing available, the contract need not live up to the standard a bank would use in order to determine financing. However, there are two flaws in this reasoning. First, this line of thought ignores the principle, as we have stated above, that intent to be bound is an objective standard. A reasonable

10

person would expect such a contract to be reduced to a formal writing. The buyer's unusual financing capabilities should not enter into a court's objective determination. Second, a bank's standard for financing is a useful reference point for determining the objective standard for when a contract of this nature would be reduced to a writing, and it is therefore relevant not for the subjective value of whether or not this transaction would have been financed but for determining the objective standard. We agree with the court that "[t]his [factor] cuts against enforceability."

¶ 25. We finally address the second aspect of the fourth factor: whether the potential contract is so complex that the partners could not reasonably have expected to be bound without a writing. Here, we conclude that it was. The contract the buyer prepared included a twelve-page Stock Purchase Agreement and a separate six-page Non-Compete Agreement. The court found that "there is no evidence presented that there was anything complicated about this deal." However, seller presented evidence that this contract contained numerous complicated provisions, including the claw-back and the Non-Compete Agreement. Seller testified, "[n]othing's simple about a 3.6-million dollar deal." While the court did not find this evidence credible, and while that determination lies with the court, the court erred in stating that there was "no evidence" of complexity. Further, the fact that the partners were considering a very similar agreement—the buy-sell agreement—to which they both agreed they were not bound without a signed writing also demonstrates that this potential contract was so complex that the partners could not reasonably have expected to be bound without a writing. This factor therefore weighs against enforceability.

¶ 26. Having determined that the partners did not intend to be bound, we next look to the definiteness of terms in the agreement. Here, framed only by the two e-mails, the terms of the agreement are unclear. First, the very nature of what seller was selling was unclear. In his December 26 e-mail, seller referred both to "my share of [the company]" and "the entire

company." Buyer, in his reply on December 31, refers to "your shares of [the company]". "Share" and "shares" are distinct terms, and neither of them refers to a non compete or non solicitation agreement. Buyer replied by sending the Non-Compete Agreement on January 9—and referring to it as a "condition precedent" of the Stock Purchase Agreement—revealing that he assumed that the terms "share" and "shares" must include such an agreement. In other words, buyer assumed that the Non-Compete Agreement was part of the contract as agreed to in the e-mails. If he had not made such an assumption, buyer could have sent a cover letter explaining that he was proposing additional terms, which the court acknowledges "certainly would have been simpler," but he did not.

¶ 27. Second, the price seems unclear. While both partners refer to the same price for seller's "shares," buyer lowered that price by $50,000 in his draft contract, calling the difference in consideration the price of the Non-Compete Agreement. Finally, the e-mails lay out none of the particulars regarding the claw-back provision. These particulars are important because in buyer's version of the claw-back provision, he could sell up to 75% of the company within two years without having to pay seller, whereas the proposed buy-sell agreement's claw-back provision triggered the claw-back at 50%.

¶ 28. We come now to the question of whether buyer's response to seller's offer was an acceptance with a proposal of additional terms or—instead—a counter-offer. "A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer." Restatement (Second) of Contracts § 39(1) (1981). "An offeree's power of acceptance is terminated by his making of a counter-offer." Id. § 39(2).

¶ 29. Buyer later argued that his response was not a counter-offer by stating that he would give in on all the terms in his draft that differ from the terms in seller's e-mail. However,

intent to be bound is an objective test to be determined at the time of agreement. Buttolph, 2003 VT 82, ¶ 17 ("The intent of the parties to be bound, however, is a question of fact to be determined by examining the objective words and deeds of the parties."). Further, regarding counteroffers in Vermont:

> It has long been the law in Vermont and elsewhere that an acceptance of an offer, to be good, must in every respect meet and correspond with the offer. An acceptance on terms varying from those proposed is, in effect, a counter proposal, and is not binding until it is itself accepted.

Okemo Mountain, Inc. v. Okemo Trailside Condominiums, Inc., 139 Vt. 433, 435, 431 A.2d 457, 459 (1981) (quotation omitted); see also Rule v. Tobin, 168 Vt. 166, 171, 719 A.2d 869, 872 (1998) ("Under contract law, an acceptance of an offer must be unconditional"); Benya v. Stevens & Thompson Paper Co., 143 Vt. 521, 525, 468 A.2d 929, 931 (1983) ("An acceptance that modifies or includes new terms is not an acceptance of the original offer. It is a counteroffer."). Therefore, the court erred in finding that buyer's response to seller's offer was an acceptance with additional proposals, and we conclude that buyer's response was a counteroffer.

¶ 30. The court found that "[t]his case is akin to Camara v. Camara," where we ordered specific performance of a divorce agreement. We disagree for three reasons. First, in Camara, we ordered specific performance of a completed agreement with no open terms. 2010 VT 53, ¶ 6, 188 Vt. 566, 998 A.2d 1058 (mem.) ("[T]he terms of settlement set forth in the e-mail were comprehensive of all the issues in the divorce."). Second, Camara involved a litigation settlement negotiated by the parties with the help of their counsel. Here, buyer and seller are two businessmen discussing a possible deal and, while buyer discussed the deal with counsel, there is no evidence seller consulted counsel until receiving the December 31 e-mail. Finally, the public policy considerations here are markedly different from those in Camara. There is a strong public

policy in favor of settling litigation. See <u>New England Educ. Training Serv., Inc. v. Silver St. Partn.</u>, 148 Vt. 99, 101, 528 A.2d 1117, 1118 (1987). But the public policy considerations here, as we discussed above, are different—split between giving credence to parties' expectations and discouraging "gotcha contracts." Buyer's reliance on <u>Willey</u>, a case which shares many similarities with <u>Camara</u>, is inapplicable for the same reasons.

¶ 31. Because we conclude that there was no enforceable contract between buyer and seller, we need not consider whether the contract—had it existed—would have been enforceable by specific performance. We also need not speculate as to the meaning of "good faith" in the court's ruling. But we do note that enforcing contracts to negotiate future terms in good faith by specific performance is extremely difficult, and courts have traditionally gone to great lengths to avoid doing so. The Second Circuit, for example, refused to enforce such a contract by specific performance in <u>Brown v. Cara</u>, even though the parties there had a signed writing. 420 F.3d 148 (2d Cir. 2005).

¶ 32. Finally, we address buyer's cross-appeal. Buyer urges us to find that the contract was enforceable as written and to find that seller is obligated, not to negotiate in good faith, but to abide by the terms of the contract without further negotiation. Both preliminary agreements that would require further negotiation in good faith and contracts that are enforceable as written must be analyzed under the same factors we have considered here. To be enforceable, both a contract and a preliminary agreement require the same burden of proof—a preponderance of the evidence. Therefore, because the parties have not shown the requisite intent to be bound to meet the standard of a preliminary agreement, they also have not shown the intent to be bound necessary for a contract to be enforceable as written. We therefore agree with the trial court that buyer and seller did not enter into a fully enforceable contract. Further, as stated above, we reverse the judgment of the trial court that there was a preliminary agreement requiring the

parties to negotiate in good faith, and we conclude that buyer and seller did not have an enforceable contract.

Reversed; judgment entered for defendant.

FOR THE COURT:

_____

Chief Justice

¶ 33.  **ROBINSON, J., concurring.**  I concur in the result because the "claw-back" is an essential component of the purported deal, and the parameters of the claw-back are sufficiently complex and individualized that a general reference to the broad concept of a claw-back is insufficient to establish a binding contract.  Notwithstanding the purported agreement for the sale of the shares, without a meeting of the minds as to the way the claw-back would operate, the parties did not truly have a deal.  There is no evidence of any customary trade practices that would reasonably enable a court to fill in the blanks as to the specifics of that provision, and I do not believe a court could rely on the proposed terms from the parties' prior negotiation which ended without a meeting of the minds.

¶ 34.  I write separately because I cannot join the majority's suggestion that the parties' failure to address whether or not their agreement would include a form of non compete or non solicitation agreement rendered it illusory or fatally incomplete.  A non compete agreement may be desirable in connection with sales like this; it may even be common.  But in contrast to the details concerning the claw-back, a non compete agreement is in no way essential to a coherent agreement that can be understood and enforced by a court.  The fact that a party subsequently seeks to add a non compete term to an otherwise complete agreement to buy a business, or shares in a business, cannot render the underlying agreement illusory and incomplete.

15

¶ 35. To suggest otherwise would invite buyers to engage in a form of "bait and switch," negotiating a concluded agreement, then strategically raising additional non compete terms to either move the goalposts on the seller or avoid the contract. If the initial agreement in this case could have been fully understood and readily enforced without a non compete provision, the absence of any discussion about such a provision in the parties' initial email exchange would not have undermined the integrity of their agreement. See Osler Inst., Inc. v. Forde, 386 F.3d 816, 818-19 (7th Cir. 2004) (concluding that non compete provision was not so essential to purpose of contract that invalidation of provision would void contract in its entirety); Murphy v. Hosanna Youth Facilities, Inc., 683 F. Supp. 2d 1304, 1313 (N.D. Ga. 2010) (holding that parties' failure to reach meeting of minds on non competition agreement does not cause other provisions of agreement to be unenforceable because non competition agreement was not essential provision).

¶ 36. For this reason, I separately concur.

_____

Associate Justice

16