Filed 02/11/25



VERMONT SUPERIOR COURT
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org

ENVIRONMENTAL DIVISION
Docket No. 23-ENV-00021

| | |
|---|---|
| **VT Route 4 & Oxbow Road** Land Use Permit Amendment | **DECISION ON MOTIONS** |

In this matter, Sandra and Richard Conway (Ashmal Properties, LLC) (together, Appellants) appeal a December 27, 2022 decision of the District #1 Environmental Commission (District Commission) granting the Vermont Agency of Transportation (VTrans) Land Use Permit Amendment 1R0925-4 (Permit 1R0925-4) for the full replacement of an existing bridge, number 108 over Furnace Brook, and additional approach, realignment, infrastructure and construction work along Route 7, near the intersection of Vermont Route 3 and Oxbow Road in Pittsford, Vermont (the Project). Appellants also appeal a March 6, 2023 decision of the District Commission granting in part and denying in part their motion to alter the December decision.

Two motions are presently before the Court. First, on November 13, 2024, VTrans moved to reschedule the Court's merits hearing in this matter that was continued pursuant to a stipulated motion for continuance by the parties filed on November 5, 2024. Appellants oppose the motion. Second, on November 20, 2024, Appellants moved to enforce an alleged settlement agreement between the parties. VTrans opposes the motion.[1]

On January 6, 2025, this Court held a hearing on the pending motions via the WebEx platform.[2] Appellants appeared through counsel, James A. Dumont, Esq. and Christopher Boyle, Esq. VTrans appeared through counsel, Mark A. Seltzer and Melissa A. Horwitz, Esq. The Natural Resources Board (NRB) appeared through counsel, Alison Milbury Stone, Esq.

---

[1] On December 26, 2024, VTrans moved for leave to file a sur-reply relative to Appellants' motion with the proposed sur-reply attached thereto. This Court granted that motion on the record at the Court's January 6, 2025 hearing on motion.

[2] The Court notes that this hearing was noticed in both the present docket and a related docket, No. 24-ENV-00066, in which Appellants appeal a municipal decision of the Town of Pittsford Zoning Board of Adjustment related to the Project. While the Court understands that the present motion has implications for the municipal appeal, the pending motions were only filed in Appellants' Act 250 appeal docket, the present docket, No. 23-ENV-00021.

**Factual Background**

This appeal was filed in March 2023. Following an unsuccessful formal mediation in September 2023, this matter was set for trial on November 12 through 14, 2024. Prior to trial and following the unsuccessful mediation, the parties engaged in informal negotiation discussions. The facts giving rise to the document that Appellants assert is an enforceable settlement agreement are a result of the negotiations and are largely not disputed unless otherwise noted herein.

On April 21, 2024, Attorney Dumont sent VTrans' counsel a proposed settlement document (the April Proposal) including an initial ¶ 2.E, which stated:

> E. From the south end of the approach slab, the painted island will continue to flare to 14 feet in a manner that directs the right turn movement as shown on Settlement Attachments 1 & 2. The outer 4 feet along both sides of the island will be painted.

See Declaration of J. Dumont at ¶ 19 (filed on Nov. 20, 2025) (hereinafter, the Dumont Declaration).

As set forth in other provisions of the April Proposal, the island would be raised. In July 2024, VTrans responded to Appellants April Proposal with a counteroffer and deleted ¶ 2.E in full, including any references to raising the island (the July Counteroffer). Id. at ¶ 22. On August 9, 2024, Appellants responded to VTrans' July Counteroffer again proposing a revised version of ¶ 2.E (the August Proposal), which stated:

> E. Beginning at Sta 253+11±LT, the painted island will flare to from 4 feet wide to 14 feet at Sta 252+75±LT in a manner that directs the right turn movement as shown on Settlement Attachments 1 & 2. The outer 4 feet along both sides of the island will be painted.

Id. at ¶ 23.

Again, Appellants' August Proposal stated that the island would be raised. In an August 22, 2024 response to the August Proposal, VTrans revised the language in ¶ 2.E using "redline" edits (the August Response). As revised the language remaining stated:

> 2.E. Beginning at Sta 253+11±LT, the painted island will flare to from 4 feet wide to 14 feet at Sta 252+75±LT.

Id. at ¶ 25.

Again, VTrans rejected raising the island. On September 4, 2024, Attorney Dumont responded to VTrans' August Response by again offering the same language as he proposed on August Proposal. Id. at ¶ 26. On September 23, 2024, VTrans responded by again providing the revised language of ¶ 2.E that it sent on August 22, 2024. Appellant Exhibit 2 (hereinafter the September Document). Again, VTrans rejected a raised island.

2

The September Document is a letter to Appellants from VTrans. The September Document contains a cover letter and then a "redlined" document that contains edits and various dated comments from both VTrans and Appellants.[3]  It is not entitled a "Settlement Agreement" and contains no signature blocks.  The cover letter states that the letter was being provided "in the interest of good faith negotiations." Id.  It goes on to state that "[s]hould VTrans and the Conways enter into this settlement agreement in principle, the parties agree that VTrans will provide an updated intersection plan that is consistent with the spirit of any settlement agreement." Id.  Within the body of the September Document, with respect to ¶ 2.E, Vtrans has a comment dated August 22, 2024, stating that "[Appellants'] proposal to flare the painted island as described essentially recreates a slip lane which is not acceptable.  Attachments 1 and 2 in [Appellants'] settlement proposal are not feasible as they create a slip lane." Id.  In a comment dated September 23, 2024, VTrans stated that it reiterated its August 22 comment.  Id.

Additional comments remaining in the redlined September Document indicate that both parties understood that, as stated in the cover letter to the September Document, at a minimum, revised design plans for the intersection would be required to finalize any agreement reached.  See id. at 2 ("VTrans Comment (September 23, 2024): . . . Regardless, design plans will be updated based upon a settlement agreement that the parties arrive at in principle."); Id. at 8 ("VTrans Comment (August 22, 2024): . . . VTrans must have its design team develop updated plans to provide the proper radii similar to that as drafted in [Appellants'] Settlement 1&2 for the Stamped Concrete Island"); Id. ("Conway Explanation 9-4-24: . . . If the parties can reach agreement on all terms, we expect that several revised plans will be used as exhibits to the agreement. [Appellants] agree that the design must include proper radii . . ..").

On October 9, 2024, VTrans clarified the September Document with respect to terms largely not relevant with regard to the pending motion and related to the delineator spacing.

On October 29, 2024, Attorney Dumont emailed VTrans accepting the terms of the September Document, as modified on October 9, 2024.  His email concluded by stating "[w]e have more drafting to do to get this into form that will be presentable to the Court!"  VTrans Ex. D.  VTrans' Attorney Seltzer responded by stating in relevant part that:

> We will run a few checks on the proposed settlement with AGO
> Leadership (this is something that happens in all settlements).  We will
> send a clean offer back to you after conferring with AGO Leadership.

---

[3] Appellants assert that the Court cannot take into consideration these comments and other "extrinsic" evidence. The Court addresses this assertion below and, for the reasons set forth therein, disagrees.

> We have asked our client to revise the plan set to reflect the offer language.

Id.

On the same day, Attorney Dumont replied to Attorney Seltzer stating that he had assumed Attorney Seltzer had authority to make the offer when he did so and that he did "not accept the proposition that the offer was made without authority to do so." Id.

Attorney Alfonso Villegas, then-co-counsel for VTrans, responded that:

> We did have settlement authorization. However we need to update the Central Office on the specifics of the current settlement agreement. These are some of the extra hoops that AAGs have to jump through, unfortunately.

Id.

At this point both VTrans' and Appellants' counsel agreed that the Court should be notified as the Court had scheduled a merits hearing for November 12 through 14, 2024. Id.

On October 30, 2024, Attorney Dumont asked the NRB's counsel, Attorney Stone, for the NRB's thoughts on the September Document. The following day, Attorney Stone responded, stating:

> Glad to hear you have reached an agreement in concept.
>
> I'm reviewing with my client . . . Please feel free to continue writing up the proposal in a form that could be submitted to the court to keep things moving (site plan, draft permit).
>
> As previously discussed, items that are included in a settlement because they are important to parties should not be labelled as "critical" if they are not truly critical under Act Rule 34(E), which states in part: "In reviewing any amendment application, the District Commission shall first determine whether the applicant proposes to amend a permit condition that was included to resolve an issue critical to the issuance of the permit. This determination shall be made on a case-by-case basis. A permit condition is included to resolve an issue critical to the issuance of the permit if the Project would not comply with one or more Act 250 criteria without the permit condition." So for anything another party wants to be labelled as a critical permit condition, we need to see and evaluate a clear articulation of why you think it is "critical" under the rule/applicable framework. I note that even if an agreed-to part of a project proposal is not required by a critical permit condition, a permittee still needs a permit amendment for material change.

4

> Also, have you evaluated whether any of the changes present impacts under other criteria (eg aesthetics/historic resources, for flashing sign or otherwise) or extend to interests of parties not represented here?

Id.

On October 30, 2024, prior to any response regarding the issues raised by NRB, Attorney Dumont filed a letter with this Court stating that "my clients have reached a comprehensive settlement with [VTrans] on both matters. . . . The NRB is still reviewing the terms with regard to No. 23-ENV-00021." See Appellants' Letter to the Court (filed on Oct. 30, 2024).[4]

The parties then awaited final documents. On November 5, 2024, all parties filed a joint motion to continue trial because the "parties are working to resolve this matter through a written settlement and seek additional time to focus on these efforts." The Court granted the motion the following day.

Also on November 5, 2024, VTrans' counsel sent Attorney Dumont a revised draft and plans, which did not include ¶ 2.E or its terms as presented in the September Document. The island provided was 4 feet wide throughout and was not flared. Attorney Dumont immediately objected to the revisions. VTrans' counsel responded to the objection by stating there was a "misunderstanding" and that it had not intended to offer an island wider than 4 feet.

On November 13, 2024, VTrans filed a motion to reschedule the merits hearing on the grounds that the parties had "reached an impasse" in finalizing settlement terms. NRB consented to the motion while Appellants did not. On November 20, 2024, Appellants filed a "motion to enforce settlement agreement." VTrans objects to the motion.

## Discussion

The present motion requires the Court to determine whether the September Document, as modified on October 9, and Appellants' subsequent acceptance of the terms of the response and modification, constitute an enforceable contract between VTrans and Appellants despite the fact that it is not a fully executed document.

In the absence of a fully executed document, the Vermont Supreme Court has identified a four-factor test to determine whether parties intended to be bound:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial

---

[4] VTrans argues that this letter was filed without its consent. While VTrans may dispute the language used by Attorney Dumont in his letter, there appears to be at least consent from VTrans that the Court be notified of the progress the parties were making towards settlement.

performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

Catamount Slate Products, 2003 VT 112, ¶ 17 (quoting Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985)).

Prior to applying these factors to the September Document and present motion, we must address Appellants' argument that the Court may not consider extrinsic evidence of comments within the September Document or, potentially, any other extrinsic evidence. In support of this argument, Appellants cite to Kipp v. Estate of Chips, 169 Vt. 102, 107 (1999) and Isbrandtsen v. North Branch Corp, 150 Vt. 575, 577 (1988) for the principle that extrinsic evidence may not be used to interpret the meaning of a contract term when the meaning is not ambiguous. Both Kipp and Isbrandsten are irrelevant here. Both cases involved executed deeds, or executed agreements between parties, and how the courts should interpret such agreements when disputes arise under their terms. It is not disputed that the September Document is not an executed agreement between the parties. The relevant standard for determining whether the September Document is enforceable is set forth in Catamount Slate. The Catamount Slate factors set forth above, and the cases interpreting those factors, set forth below, are predicated on the fact that this Court can review extrinsic evidence of the context of the September Document, including what lead to its drafting, what's included or not included therein, and what followed it. See Miller v. Flegenheimer, 2016 VT 125, at ¶ 18, 203 Vt. 620 (noting that when reviewing the first factor the Court should "look at the parties' correspondence and other documentary evidence") (internal quotation and citation omitted); see also Catamount Slate, 2003 VT at ¶ 17 (setting forth a factor that includes partial performance).

By requesting that this Court exclude extrinsic evidence, which Appellants assert would include language that is within the document that they assert to be a settlement agreement itself, Appellant asks the Court to take the September Document at face value on the alleged terms alone, putting blinders on to all other words on the page and removing all context. This is not the standard that the Court is directed to apply when reviewing an unexecuted writing such as the September Document. Under Catamount and its progeny of cases, this Court must use the relevant factors to place the document into context and consider circumstances both within and outside of the document. As such, the Court declines to exclude consideration of extrinsic evidence that is relevant to the pending motion. This includes comments by both Appellants and VTrans that are within the document itself.

## I.      Factor 1

"When determining whether the [parties] expressly reserved the right not to be bound, we first look at the 'parties' correspondence and other documentary evidence.'" Miller, 2016 VT at ¶ 18 (quoting Catamount, 2003 VT at ¶ 18. We look at the parties' intent to be bound at the time through actions at the time of the agreement. Id. (citation omitted). In Miller, the Court noted that the Second Circuit, which has adopted Catamount, has found references to future writings as an intent not to be bound. Id. (citing Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (1989) ("The language of the November memorandum – two references to the possibility that negotiations might fail and the reference to a binding sales agreement to be completed at some future date – shows that Arcadian did not intend to be bound.").

Appellants argue that the September Document was the "definitive document" such that the first factor of the Catamount test weighs in favor of enforceability.

We disagree. The September Document contained a cover letter and a redlined document that included edits and significant non-contract comments from both parties, including related to the at-issue ¶ 2.E and VTrans' assertion that it was "not feasible" as proposed as of the date of the document. Ex. 2. The cover letter calls the draft an "offer" and notes that additional intersection plans would be required "consistent with the spirit of any settlement agreement." Id. at 1.[5]

What's more, Appellants claim that the September Document was the "definitive document" is counter to their response to the document. Emails from Appellants' counsel after October 29, 2024 when the terms were accepted specifically note that additional writings were required to finalize any agreement in principle[6] that the parties have reached. See Ex. D; see also Stipulated Motion (filed on Nov. 5, 2024) (representing to the Court that "parties are working to resolve this matter through a written settlement and seek additional time to focus on these efforts.").

In sum, there is no signature page on the document, and it is functionally still in draft form. Comments within the document from both parties itself further indicate additional documents would

---

[5] It is for this reason, as well as those addressed below, that we disagree with Appellants assertion that the September Document was a self-described "settlement agreement." The assertion that the September Document was, in itself, a "settlement agreement" is contrary to the terms of the document, comments and edits remaining therein, and the parties' actions in response to the document.

[6] Because we conclude that the September Document and context thereof does not satisfy the Catamount Slate standard, we do not address the parties' dispute as to whether an "agreement in principle" can, or cannot be binding in and of itself, or that statements stating that the at-issue agreement is "in principle" only mean that the agreement is not enforceable. Instead, the relevant standard is set forth in Catamount Slate. To the extent that the Court cites to language between the parties referring to the document as an "agreement in principle" such a reference is to the context of the document pursuant to the Catamount factors.

be forthcoming, including revised design plans. Comments on the exact term at issue in this motion from VTrans on the date of the document state that they object to the specific proposal because it was "not feasible." Ex. 2. The document itself defines itself as an "offer" submitted in good faith, not a draft agreement. Despite this, Appellants assert that it is functionally a final settlement agreement. That is not consistent with the document.

Appellants additionally argue that there no express reservation not to be bound within the document itself. In so doing, they cite to Winston v. Mediafare Entertainment Corp., which is cited by the Miller decision. 777 F.2d 78. Appellants assert that the partially executed mediation agreement in Winston contained an "express reservation" not to be bound in the absence of a writing. The Winston decision, however, finds that there was no express reservation not to be bound prior to the execution of the document but that such a reservation could be inferred by the parties' correspondence. Id. at 81 ("Although neither party expressly reserved the right not to be bound prior to the execution of a document, language in the correspondence does reveal such an intent."). The Court then found such an express reservation by correspondence from the party seeking to enforce the unexecuted document including references to "proposed agreement," and that activities would be "subject to the consummation of the agreement." The Court then concluded that this party "had considered unexecuted versions of the agreement to be nothing more than drafts or proposals and not, as he later testified, final binding agreements." Id. The Court further referenced terms of the unexecuted agreement which noted that execution shall trigger certain activities.

Similar circumstances are present here. First, Appellants attorney recognized that a final agreement was required after his acceptance on October 29, 2024. Second the September Document, recognizes this as well, calling itself an "offer" and, if accepted, a "settlement agreement in principle" that would require additional documentation and design plans "consistent with the spirit of any settlement agreement." Further, given its draft form and significant non-term comments, there is language within the body of the document indicating that it is only binding if a final agreement is reached and executed and that the document itself is not a binding agreement on all parties but instead a proposal. This includes comments from both parties, both before and, most importantly, as of the date of the September Document. See Ex. 2 p. 2 (comment from Appellants dated September 4: "If the parties can reach an agreement on all terms, we expect that several revised plans will be used as exhibits to the agreement."); Id. (VTrans comment dated September 23: "Regardless, design plans will be updated based upon a settlement agreement that the parties arrive at in principle."); Id. (VTrans comment dated September 23: "When the parties arrive at an agreement in principle, VTrans will

8

provide updated plans based upon such an agreement/settlement."); Id. at 5 (VTrans' comment dated August 22, reiterated on September 23: "The Conways' proposal . . .."); Id. at 8—9 (VTrans comment dated August 22, reiterated on September 23: "Practically, a compromised settlement between the parties will require new and updated design plan. Once there is an agreement in principle, VTrans will provide an attachment for review by the parties."); see Id. page 9 ¶ 5.D (referring to items "in place at the time of execution of the settlement agreement . . .."). This can also be inferred by VTrans reiterated objection to ¶ 2.E's configuration within the document itself.

While the September Document contains no express proposed term reserving the right not to be bound unless executed, such a reservation must be inferred by the fact that the document is in draft form, contains extraneous commentary contemplating a future agreement, and is not executable in its form. Given this context, it is to be expected that the document would not contain explicit terms that the parties are not bound until a subsequent draft is executed. It is plain on its face, however, that a reservation is inferred by the context of the document, including how it was presented, its substance, and the subsequent actions by the parties.

Thus, we conclude that the parties expressly reserved the right not to be bound until a future drafted settlement agreement was executed. This factor weighs in favor of unenforceability.

## II. **Factor 2**

Factor 2 is partial performance. No action has been taken under the contract and the Vermont Supreme Court has recognized that this factor weighs against enforceability when no action has been undertaken. Id. at ¶ 20.

Appellants cite to Willey v. Willey, 2006 VT 106, for the argument that this Court's granting a stipulated motion to continue trial and subsequently cancelling the November hearing dates constitute partial performance under the September Document. We disagree. In Willey, in addition to a $50,000 payment from husband to wife that was required under a subsequently unexecuted written agreement settling a divorce in between trial days of a divorce proceeding, the merits hearing was removed from the family court docket due to the agreement between the parties. 2006 VT 106, ¶ 16. Both of these actions, not just the cancellation of trial but such cancellation coupled with a monetary payment under the agreement, were partial performance.[7]

---

[7] Appellants also cite to a federal case from New York in which the parties on the record minutes after the court opened the hearing on the matter requested that the jury drawn to hear the trial be discharged because trial was no longer required due to the purported settlement. Chang v. C.K. Tours, Inc., 605 F.Supp.3d 529, 536 (S.D.N.Y. June 6, 2022). Such action, taken at trial, when a jury has been drawn, is fundamentally different to a stipulated motion to continue trial to allow additional time for settlement in a bench trial approximately one week before trial was set to begin.

No party in this action withdrew from this Court's docket nor was this litigation ever abandoned. Instead, the parties requested, and the Court granted, a continuance of trial "in the interest of judicial economy" to continue their efforts to resolve this appeal through written settlement and sought additional time to do so. See Stipulated Joint Motion to Continue (filed on Nov. 5, 2024). A continuance, which specifically requests additional time to allow parties to work towards a final settlement agreement, is different than a request to fully withdraw a trial or case due to an imminently forthcoming final settlement agreement. This is particularly true when there is no other evidence of partial performance under the purported agreement. Further, trial in this case was continued on November 6, 2024, when the Court granted the parties' stipulated November 5, 2024 motion. Approximately one week later, on November 13, 2024, VTrans moved to reschedule the merits hearing. This can at best be described as a brief pause in litigation.

To the extent, however, that the requested continuance amounts to some level of partial performance, absent other actions by either party, we find that this factor does not weigh in favor or against enforceability. See Conway v. Brooklyn Union Gas Co., 236 F.Supp.2d 241, 250 (E.D.N.Y. Nov. 7, 2002); Lopez v. City of New York, 242 F.Supp.2d 392, 394—95 (S.D.N.Y. Jan. 30, 2003).

### III.   Factor 3

Factor 3 addresses whether all of the terms have been agreed upon. "[I]t is true that 'not all terms of a contract need to be fixed with absolute certainty,' [but that] it is also true that an agreement 'in which a material term is left for future negotiations, is unenforceable.'" Id. The Court will not imply terms because it "would be to impermissively [sic] make a contract for the parties rather than to enforce any bargain the parties themselves may have reached." Id. at ¶ 22 (quoting Candid Prods. v. Int'l Skating Union, 530 F. Supp. 1330, 1335 (S.D.N.Y. 1982)).

VTrans argues that this factor weighs against enforceability because the September Document required future intersection and design plans that were compliant with State design standards, and that those specific standards were not specified in the document. Appellants disagree because they assert that any subsequent design or intersection plan was required to conform to the terms of the September Document. The cover letter to the September Document states that updated plans would be "consistent with the spirit of any settlement agreement." Ex. 2. The comment to the at-issue ¶ 2.E states that the Appellants' proposal was "not feasible as they create[d] a slip lane." Id. Later in subsection 2, Appellants note that, if the parties were to reach an agreement on all terms, "several revised plans will be used as exhibits to the agreement. [Appellants] agree that the design must include the proper radii . . .." Id. VTrans agreed.

The Court believes that this factor weighs neutrally in the present circumstances. The parties understood that subsequent design and intersection plans were required if an agreement were to be reached. The parties also appeared to agree that those plans would both be consistent with the "spirit" of the agreement and the relevant design standards. It is unclear based on the record before the Court how much deviation from the September Document was agreeable to the parties. In fact, the present motion makes clear that the parties have different understandings of this issue and of ¶ 2.E generally.

More importantly, however, is that it is also clear from the document itself that VTrans, even as of the date of the September Document, had concerns with the proposed island set forth in ¶ 2.E. This is the material term before the Court in this motion and, as set forth in the September Document, the design was disputed even as presented. Those concerns were not addressed until the final drafting stage of the agreement and the related updated plans. In light of all of this, even some of the material terms were largely agreed upon, disputes about ¶ 2.E were stated within the document and the subsequent design plans were unclear. This factor weighs neutrally.[8]

## IV.    Factor 4

"The fourth <u>Catamount</u> factor has two aspects: first, whether the agreement at issue is of a type that is usually committed to writing and, second, whether the agreement is so complex that the parties could not reasonably have expected to be bound without a writing." <u>Willey v. Willey</u>, 2006 VT 106, ¶ 18, 180 Vt. 421, 912 A.2d 441 (quotation omitted). Further "where 'the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation." <u>Catamount Slate</u>, 2003 VT 112, ¶ 24 (citing <u>Winston</u>, 777 F.2d at 83). We construe this factor to ask whether this is the type of contract usually reduced to a formal writing of the type in order to be enforceable. <u>Miller</u>, 2016 VT at ¶ 23.

---

[8] At this Court's hearing on the motion, VTrans' engineer Carolyn Cota testified that Appellants proposal did not meet the level of safety that VTrans believed was required for the intersection. This is concerning to the Court. The lack of clarity between the parties on this issue and how it relates to the safety of this intersection further supports this Court's conclusion to weigh this factor weighs neutrally. Whether or not there was an agreement on the material terms of the intersection design, even despite the language within the September Document indicating at that time VTrans had concerns, it must be recognized that this case is not a cause of action between two private parties concerning private land or wholly private causes of action. This is an appeal of an Act 250 permit amendment issued to the State for a State highway project involving the reconstruction and redesign of public highway and associated infrastructure. The Court has concerns about binding VTrans, the state agency tasked with maintaining Vermont's roadways and associated infrastructure, to a design that it deems insufficient to meet safety needs based on the form and substance of the September Document, including its informal and draft format, and the document's reservation that updated design plans were required. The Court understands that Appellants disagree with the Vtrans' assessment of safety. This disagreement does not quell the Court's concerns about binding VTrans to this configuration based on a redlined, unsigned, informal writing.

The Court finds the purposed agreement is the kind that is typically committed to formal writing. At issue is the resolution of a litigation dispute between the parties, much like that at issue in Willey, Catamount Slate, and Winston. Further, this litigation concerns the design and construction of a state highway intersection and bridge, which it is not legitimately disputed requires design and intersection plans, in addition to any agreement between the parties. The document Appellants purport to be a settlement agreement is, again, a redlined draft Word document containing comments, including a comment in which VTrans takes issue with the configuration of the island at issue here. It is not entitled a "settlement agreement" and contains no signature blocks. It is not, as Appellants repeatedly assert, itself a "settlement agreement."

What's more, this is an Act 250 permit appeal. Writings and plans are required for review by the NRB for its review and determination as to whether any subsequent action must be taken by the parties and, if all was acceptable, plans and designs must be incorporated into permit conditions.[9] Appellants' counsel represents that Vermont litigation is "routinely" settled orally or by similarly informal documents such as the one before the Court. Even assuming this is true, it cannot be disputed that the parties in this case contemplated a clean and true settlement agreement more formal than the September Document and that, in this land use permitting context, a formal written agreement is functionally required for review and approval by the NRB and incorporation into a final land use permit, if approved. It is axiomatic that a formal writing with associated planning documents is required in such a multi-party permitting appeal where the subsequent permit sets forth significant rights and obligations of VTrans relative to the Project in the near and long term.

For these same reasons, the agreement is sufficiently complex that a formal writing is required. Again, this document relates to the resolution of a permit appeal which would require additional review by the NRB, including of all design and intersection plans, to ensure revisions to the project conform with Act 250 rules and regulations. Again, this is a dispute regarding a state-owned highway reconstruction and redesign project which implicates numerous public policy concerns, including safety and traffic management. These matters are neither informal or simple, as demonstrated between the disputes between these parties regarding ¶ 2.E and the purposed island's implications on both traffic and safety.

Thus, we conclude that the fourth factor weighs against enforceability.

---

[9] This is further reflected in the September Document itself, which state that the proposed conditions were to "be part of the amended Act 250 permit . . . and that each of these conditions is critical within the meaning of [Act 250 Rule,] Rule 34." Ex. 2. This language indicates that writings are required.

**Conclusions**

For the foregoing reasons, none of the four <u>Catamount</u> factors weigh in favor of enforcing the September Document as a settlement agreement. The first and fourth factors both weigh against enforceability. The second and third factors, at best, weigh neutrally. Thus, Appellants motion to enforce is **DENIED**. VTrans' motion to reset merits hearing is therefore **GRANTED**.

The Court will set this matter for a final pre-trial status conference to discuss trial readiness and the scope of trial. Additionally, on or before **Friday, February 28, 2025**, the parties shall file their dates of unavailability for a three-day merits hearing to be held via the WebEx platform in the March, April and May 2025.

Electronically signed this 11th day of February 2025, pursuant to V.R.E.F. 9(D).

*Tom Walsh*

Thomas G. Walsh, Judge
Superior Court, Environmental Division